## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| RHONDA HENDERSON; ROBERTA FAULKS; and RACHEL CHURCH, on behalf of themselves and all others similarly situated, | ) ) ) ) Case No. 20-cv-12649 |
| | ) |
| | ) Hon. Sean F. Cox |
| Plaintiffs, | ) |
| | ) Mag. J. |
| vs. | ) R. Steven Whalen |
| | ) |
| VISION PROPERTY MANAGEMENT, LLC; VPM HOLDINGS, LLC; FTE NETWORKS, INC.; US HOME RENTALS, LLC; KAJA HOLDINGS, LLC; KAJA HOLDINGS 2, LLC; MI SEVEN, LLC; IN SEVEN, LLC; RVFM 4 SERIES, LLC; ACM VISION V, LLC; DSV SPV 1, LLC; DSV SPV 2, LLC; DSV SPV 3, LLC; BOOM SC; ALAN INVESTMENTS III, LLC; ARNOSA GROUP LLC; MOM HAVEN 13, LP; ATALAYA CAPITAL MANAGEMENT LP, | ) CLASS ACTION ) ) DEMAND FOR JURY TRIAL ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## FIRST AMENDED COMPLAINT

Plaintiffs Rhonda Henderson, Roberta Faulks, and Rachel Church, on behalf

of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this

civil rights class action against Defendants Vision Property Management, LLC

("VPM") and its affiliated entities, (collectively, "Vision"), FTE Networks, Inc. and

US Home Rentals, as successor organizations, and Atalaya Capital Management LP,

for violations of the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*

("FHA"), the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"), the Truth In Lending Act, 15 U.S.C. § 1601 ("TILA"), and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 ("RESPA").

## I.  INTRODUCTION

1.   This action arises out of Vision's discriminatory targeting of Black homebuyers for abusive credit terms in home purchase transactions. Promising these prospective homebuyers the American dream of homeownership, Vision ensnared residents in predominantly Black Detroit-area communities in predatory and discriminatory contracts that were structured to fail. Despite Vision's promises, few prospective homebuyers actually achieved homeownership. Instead, Vision's practices have fueled evictions in the Detroit area.

2.   Vision's practices require prospective homebuyers to take on all of the obligations of homeownership with none of the rights. Vision sells properties in extremely poor condition to these would-be homeowners, who invest thousands of dollars and countless hours of their own labor making the home habitable, only to lose all of that investment and all of the money paid under the contract in the event of a default. Unlike a homeowner with a mortgage, who is entitled to keep the benefit of their labors and financial investment in a home, Vision's purchasers do not accrue that benefit or build any equity. And unlike a homeowner with a mortgage, who is entitled to the protections of the foreclosure process in the event of default on their

loan, Vision's purchasers are often removed through summary eviction proceedings, which Vision frequently threatens in the event of late payments.

3.     Vision induced prospective homebuyers to sign its contracts based on a false promise of homeownership. In reality, Vision's practices gave prospective homebuyers almost no chance of success. Vision misrepresented the nature of the transaction, failed to disclose the cost of credit in its alternative financing arrangement, failed to disclose significant problems with the condition of the home despite having detailed inspection reports about each property, and attempted to reap enormous profits from its false promise of homeownership.

4.     Vision has engaged and continues to engage in harmful and discriminatory housing and lending practices that have a disparate impact on Black homebuyers. Its property acquisition practices in southeastern Michigan—specifically, its reliance on bulk sales of real estate owned ("REO")[1] properties in predominantly Black neighborhoods in the greater Detroit area—cause Black homebuyers to be disproportionately subject to its abusive and deceptive contracts.

5.     Vision also intentionally targeted Black homebuyers for its predatory home purchase scheme. The locations of Vision's properties skew heavily toward

---

[1] Real estate owned, or REO, is a term used to describe a class of property owned by a lender—typically a bank, government agency, or government loan insurer—after a foreclosure auction.

Black neighborhoods. On information and belief, this skew was caused by deliberate decisions to target predominantly Black neighborhoods for property acquisition. In Michigan, Vision targeted majority Black neighborhoods by purchasing 126 properties from the treasurer of Wayne County, which has by far the highest Black population in the state (nearly 40%), while purchasing homes from no other counties. Further, by advertising primarily through yard signs in Black neighborhoods, Vision marketed its home scam in a localized manner intended to reach almost exclusively Black homebuyers. Vision targeted Black neighborhoods in order to attract Black potential homebuyers, due to their actual or perceived lack of other available options for homeownership. Plaintiffs Henderson and Faulks, and others like them, have been injured by the intentionally discriminatory targeting of Vision's abusive and deceptive contracts to Black potential homebuyers.

6.      For these reasons, Plaintiffs seek class-action relief under the FHA and ECOA. Plaintiffs also raise class claims under TILA, for high-cost loan origination violations and VPM's failure to send periodic statements while servicing their loans. Plaintiffs further allege that VPM is liable under RESPA based on its improper handling of their escrow accounts for the payment of property taxes and insurance.

## II.      JURISDICTION AND VENUE

7.      Jurisdiction is conferred on this Court by 42 U.S.C. § 3613(a), 15 U.S.C. § 1691e(f), and 28 U.S.C. §§ 1331 and 1367.

8.      Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because the claims arose in this District, the Defendants do business in this District, and the events giving rise to this action occurred in this District.

### III.   PARTIES

#### *Plaintiffs*

9.      Plaintiff Rhonda Henderson is a resident of Inkster, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Henderson was a resident of Inkster in Wayne County. Ms. Henderson entered into a home purchase contract with Defendant Kaja Holdings 2, LLC in 2014.

10.     Plaintiff Roberta Faulks is a resident of Inkster, Michigan. She is Black. At all times relevant to her allegations here, Ms. Faulks was a resident of Inkster in Wayne County. Ms. Faulks entered into a home purchase contract with Defendant Kaja Holdings 2, LLC in 2016.

11.     Plaintiff Rachel Church is a resident of Mt. Morris, Michigan. At all times relevant to her allegations here, Ms. Church was a resident of Mt. Morris in Genesee County. Ms. Church entered into a home purchase contract with Defendant Kaja Holdings 2, LLC in 2015.

#### *Defendants*

12.     Defendant VPM is a Delaware limited liability company that regularly engages in the business of home purchase lending and home purchase transactions

and does substantial business in the State of Michigan. VPM's principal address is 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. VPM is not registered to do business in Michigan.

13.     VPM at all times coordinated and directly engaged in the conduct described in this Complaint. VPM decided which properties to acquire for its predatory lease with option to purchase scheme (which it called, in shorthand, its "LOP" program). VPM was the entity that interfaced with all members of the Class, established the terms of the transactions, loaned the money, and serviced the loans and escrows.

14.     Defendant VPM Holdings LLC ("VPM Holdings") is a limited liability company created by Alex and Antoni Szkaradek for the purpose of jointly owning the Affiliate Defendants, as described below, which held legal title to the properties acquired for Vision's predatory scheme. VPM Holdings owns 1% of each of the Affiliate Defendants. VPM Holdings is a limited liability company organized under the laws of South Carolina, with a physical location and mailing address of 16 Berryhill Road, Columbia, South Carolina 29210. VPM and VPM Holdings conducted all the property acquisition, management, rental, and sale activities, and all interaction with consumers and contracting activities relating to the Vision homes.

15.     VPM, along with its officers and employees, manages and controls a

large number of affiliated limited liability corporations, including Defendants Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RVFM 4, LLC, ACM Vision V, DSV SPV 1, LLC, DSV SPV 2, LLC, DSV SPV 3, LLC, Boom SC, Alan Investments III, LLC, Arnosa Group LLC, and Mom Haven 13, LP (collectively the "Affiliate Defendants").

16. The Affiliate Defendants were created by VPM and the Szkaradeks to hold legal title to the properties acquired for Vision's predatory LOP scheme. Each of the Affiliate Defendants is owned 49.5% by Alex Szkaradek, 49.5% by Antoni Szkaradek, and 1% by VPM Holdings, except for ACM Vision V, whose ownership structure is described below.

17. VPM's officers and employees also frequently act as officers and/or employees of the Affiliate Defendants. The business affairs of the Affiliate Defendants are conducted out of single location, 16 Berryhill Road, Suite 200, Columbia, South Carolina. VPM, under the direction and control of Alex and Antoni Szkaradek, controls the sales, purchases, investment portfolios, marketing, and finances of the Affiliate Defendants.

18. The Affiliate Defendants each hold title to properties in Michigan and therefore, are named in the contracts with homebuyers, are named in eviction filings seeking to remove those homebuyers, and receive notices of building code violations as the record title holder.

19. At all times VPM, VPM Holdings, and the Affiliate Defendants acted in concert with each other to carry out the practices described in this Complaint.

20. On information and belief, Alex and Antoni Szkaradek and VPM at times bought, sold, and transferred properties between the various Affiliate Defendants without any consideration changing hands. On information and belief, the Affiliate Defendants are merely shell corporate structures, and are alter egos of Defendants VPM and VPM Holdings.

21. Defendant Kaja Holdings, LLC is a Delaware limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs to transact business in Michigan and is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170. Its principal place of business is 1112 Price Avenue, Columbia, South Carolina 29210. Defendant Kaja Holdings, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

22. Defendant Kaja Holdings 2, LLC is a Delaware limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs to transact business in Michigan and is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170. Its principal place of business is 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant Kaja Holdings 2, LLC is managed and affiliated with VPM and is under the direction and control of Alex

Szkaradek and Antoni Szkaradek.

23.    Defendant MI Seven, LLC is a South Carolina limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs to transact business in Michigan and is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170. Its principal place of business is 1112 Price Avenue, Columbia, South Carolina 29201. Defendant MI Seven, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

24.    Defendant IN Seven, LLC is a South Carolina limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs to transact business in Michigan and is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170. Its principal place of business is 1112 Price Avenue, Columbia, South Carolina 29201. Defendant IN Seven, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

25.    Defendant RVFM 4 Series, LLC is a South Carolina limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs and is located at P.O. Box 30054, Lansing, Michigan 48090. Its principal place of business is 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant RVFM 4, LLC is managed and affiliated with VPM and is under the

direction and control of Alex Szkaradek and Antoni Szkaradek.

26.     Defendant DSV SPV 1, LLC is a Delaware limited liability company with a principal place of business at 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant DSV SPV 1, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

27.     Defendant DSV SPV 2, LLC is a Delaware limited liability company with a principal place of business at 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant DSV SPV 2, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

28.     Defendant DSV SPV 3, LLC is a Delaware limited liability company with a principal place of business at 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant DSV SPV 3, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

29.     Defendant Boom SC is a South Carolina limited liability company with a principal place of business at 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant Boom SC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

30.     Defendant Alan Investments III, LLC is a Delaware limited liability company with a principal place of business at 16 Berryhill Road, Suite 200, Columbia, South Carolina 29210. Defendant Alan Investments III, LLC is managed

and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

31.     Defendant Arnosa Group LLC is a New Jersey limited liability company with a principal place of business at 4 Roosevelt Avenue, Pennington, New Jersey 08534. Defendant Arnosa Group, LLC is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

32.     Defendant Mom Haven 13, LP, is a Texas limited liability company with a principal place of business at 1112 Price Avenue, Columbia, South Carolina 29201. Defendant Mom Haven 13, LP is managed and affiliated with VPM and is under the direction and control of Alex Szkaradek and Antoni Szkaradek.

33.     Defendant Atalaya Capital Management LP ("Atalaya") is a foreign limited partnership organized under the laws of Delaware and is not registered to do business in Michigan. Its principal place of business is 780 Third Avenue, 27th Floor, New York, New York 10017. As described in more detail below, Atalaya funded and substantially participated in the design of the home purchase lending business of VPM.

34.     Atalaya provided significant financing to VPM and its Affiliate Defendants in order to operate the LOP scheme at issue in this case. VPM approached Atalaya in 2012 to be a potential lender to help fund its acquisition of properties for its LOP program, including properties in Michigan. Atalaya consulted

with VPM regarding the terms and structure of its LOP form agreement, received financial records that showed the way VPM was tracking its contracts in a manner similar to a land contract, and participated in decisions regarding individual properties and contracts that were in default.

35.     Based on its review of the LOP form agreement and VPM financial records and other due diligence on and engagement with VPM, Atalaya knew or should have known that Vision was engaged in an illegal, predatory mortgage lending business in the guise of its LOP program.

36.     Defendant ACM Vision V, LLC is a Delaware limited liability company registered with Michigan's Department of Licensing and Regulatory Affairs to transact business in Michigan and is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170. Its principal place of business is 16 Berryhill Road, Suite 200, Columbia, South Carolina 29201. Atalaya, Vision's principal funder, formed and controlled ACM Vision V LLC. ACM Vision V is 98% owned by an investment fund managed by Atalaya and 1% each owned by Alex and Antoni Szkaradek. ACM Vision V owned properties located in the greater Detroit area and was the counterparty on active LOP contracts associated with those homes.

37.     Defendant FTE Networks, Inc. ("FTE") is a Nevada corporation that bought VPM and its affiliated assets and companies in December 2019. FTE's principal address is 237 West 35th Street, Suite 806, New York City, New York,

10001. FTE purchased all or substantially all of the assets of VPM and all or substantially all of the equity, assets, and liabilities of Defendants VPM Holdings, Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RVFM 4, LLC, DSV SPV 1, LLC, DSV SPV 2, LLC, DSV SPV 3, LLC, Boom SC, and Alan Investments III, LLC, which included more than 3,000 residential real estate properties in 46 states. According to FTE's website and public announcement of the merger, "Vision's management team continue as senior executives of the Company and major shareholders." Under the purchase agreement, VPM's management own shares in FTE.

38.   Defendant US Home Rentals, LLC is a Delaware limited liability company and is a wholly-owned and controlled subsidiary of FTE and was the "acquisition sub" in the purchase of VPM and its business in December 2019. On information and belief, US Home Rentals, LLC, as subsidiary of FTE, is the successor owner of all or substantially all of VPM's assets and all or substantially all of the equity, assets, and liabilities of Defendants VPM Holdings, Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RVFM 4, LLC, DSV SPV 1, LLC, DSV SPV 2, LLC, DSV SPV 3, LLC, Boom SC, Alan Investments III, LLC, including the properties which the Class members currently are purchasing through active contracts. VPM's management team, including the founders of Vision, Alex and Antoni Szkaradek, now operates US Home Rentals and are owners

of FTE stock.

39.     In FTE's December 2020 Form 8-K disclosure to the U.S. Securities and Exchange Commission, FTE stated: "In in 2021, FTE plans to take the name of our principal subsidiary US Home Rentals LLC ("USHR") as a major owner and operator of single-family rental ("SFR") homes across the United States. . . USHR is overhauling its portfolio of approximately 3,000 homes . . . ." FTE and US Home Rentals are referred to herein as the "Successor Defendants."

40.     At the time the Successor Defendants purchased Vision's equity, assets and liabilities, Vision's unfair and deceptive practices had been well documented through news stories as well as publicly filed lawsuits brought by the attorneys general of Wisconsin, Pennsylvania, and New York.

41.     Because VPM, VPM Holdings, Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RVFM 4, LLC, DSV SPV 1, LLC, DSV SPV 2, LLC, DSV SPV 3, LLC, Boom SC, and Alan Investments III, LLC, merged with and are now wholly owned by FTE and US Home Rentals through a sale of stock and cash, the Successor Defendants are liable for the violations carried out by Vision and its affiliate entities, including claims alleged herein as they were not excluded in the  purchase agreement signed by the parties on December 20, 2019.

## IV.   FACTUAL BACKGROUND

### *Historical Housing and Credit Discrimination in the Greater Detroit Area*

42.     Vision's use of predatory home purchase contracts follows a long history of housing and credit discrimination in Detroit and the surrounding areas.

43.     Beginning in the 1930s, the federal government stifled Black homeownership by granting low-interest loans and mortgages to white borrowers only. Using a rating system to evaluate the risk of lending in certain neighborhoods, the Federal Housing Administration designated predominantly Black neighborhoods as riskier and declined to insure mortgages in those areas, marking them in red on color-coded maps. This practice of "redlining" continued for decades and resulted in the widespread denial of credit and mortgage loans in Black neighborhoods.

44.     The federal government also encouraged the use of racially restrictive covenants, which forbade sale of homes to Black buyers. By the 1940s, 80% of Detroit housing outside of the inner city was subject to racial covenants, which were enforced by whites-only neighborhood associations.

45.     In 1947, the United States Supreme Court held that judicial enforcement of racial covenants violated the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, but many real estate agents, developers, banks, and neighborhood associations continued to enforce racial segregation. A citywide association of homeowner groups called the Federated Property Homeowners of

15

Detroit created a network to monitor the selling of homes to Black buyers and harassed real estate brokers who sold homes to them. Black residents who moved into white neighborhoods often faced harassment, violence, and acts of racial terrorism such as burning effigies and crosses.

46.     In 1968, Congress passed the FHA, broadly prohibiting redlining and other forms of housing discrimination. For decades, however, homeownership and credit opportunities remained scarce for many Black residents.

47.     Lacking access to a conventional mortgage, some Black residents in Michigan entered into land contracts (also known as contracts for deed) to try to achieve homeownership. These contracts were often exploitative, and their use declined in many places after the passage of the FHA in 1968 and the Community Reinvestment Act in 1977, which encouraged banks to invest in Black communities.

48.     In the 1990s and early 2000s, some banks and mortgage companies, exploiting the void left by redlining and the lack of access to good credit in communities of color in Detroit, began offering abusive credit terms to residents of those previously credit-starved communities—a practice now known as "reverse redlining." Lenders targeted Black communities where credit was traditionally unavailable and pushed the sale of high-interest and high-risk subprime mortgages, knowing that the borrowers would not be able to afford the loans. Black borrowers were more likely to receive subprime loans than white borrowers, even controlling

for differences in borrower income and credit scores. In 2000, subprime loans accounted for 75% of mortgages in Detroit, one of the highest rates in the country.

49.     By 2008, the real estate market had collapsed, and tens of thousands of Detroit homeowners were forced into mortgage foreclosure. By 2011, Detroit's foreclosure rate had surged to almost 9% of all households. Communities of color were hit hardest by the foreclosure crisis. According to a 2010 nationwide study, Black homeowners were 47% more likely to be facing foreclosure at the time than white homeowners.

50.     During the financial crisis, home values in Wayne County dropped by more than 80%. At the same time, property taxes were inflated and often unaffordable, based on out-of-date property value assessments. As a result, from 2011 to 2015, one in four Detroit properties underwent tax foreclosure.

51.     The rate of Black homeownership across Michigan plummeted from 51% in 2000 to 40% in 2016, with the largest drops in Wayne, Oakland, and Macomb Counties. In Detroit, Black homeownership, which was approximately 144,571 homes in 2000, fell to 93,506 homes by 2015. The financial crisis left the Detroit area with a glut of unsold foreclosed homes, and left many Black communities devastated and once again lacking access to credit and homeownership opportunities.

*Vision's Predatory Business Model*

52.     In the wake of the foreclosure crisis, when foreclosed homes were abundant and access to mortgage credit was extremely tight, especially in cities like Detroit, Inkster, and Flint, Vision developed a business model to exploit these inequalities in the housing market for significant financial gain. Vision bought dilapidated homes cheaply and in bulk and sold them at a significant markup to homebuyers who lacked other options for homeownership. Vision advertised its financial product as a pathway to homeownership for people who have dreamed of owning a home but had been unable to do so due to their income or credit profile.

53.     Despite this lofty marketing pitch, which promised a pathway to homeownership for those who could not get traditional mortgages, Vision's business model was structured to make it virtually impossible for anyone to succeed in becoming a homeowner.

54.     In order to carry out its business model, Vision acquired approximately 10,000 homes around the country, almost entirely from bulk REO sales.

55.     Nearly 70% of Vision's property acquisitions in Michigan were in the ten-county Detroit-Warren-Ann Arbor Combined Statistical Area ("Detroit CSA"), which encompasses Genesee, Lapeer, Lenawee, Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties.

56.     Initially, Vision explicitly structured its transactions as land contracts.

18

In a land contract, the homebuyer promises to pay a certain amount, at a certain interest rate, over a certain period of time, and is entitled to obtain the deed upon full payment of the purchase price. In Michigan, homebuyers in land contract transactions are entitled to certain statutory protections before their interest in the home can be terminated. For example, under Michigan law, a land contract can only be terminated through a foreclosure or forfeiture proceeding, which requires a pre-suit right to cure the default and at least a 90-day opportunity to redeem the property and avoid forfeiture by making the past due payments.

57.     In or around 2013, Vision began changing how it labeled its transactions, shifting to primarily using form documents that are titled "residential lease with option to purchase agreement," with a subheading "triple-net, bondable lease." Upon information and belief, Vision made this change in large part to attempt to evade laws that applied to land contracts. For example, regulations taking effect around that time were making it increasingly clear that land contracts were covered by mortgage lender licensing laws.

58.     Similarly, land contracts are covered by TILA as an extension of credit, to the extent they are for personal, family, or household purposes. This means that if Vision continued to openly label its transactions as land contracts, Vision would be obligated to disclose the interest rate, other finance charges, and repayment term for the loan, and would also be required to verify the borrower's ability to pay, in

19

addition to complying with licensing requirements.

59.     Despite captioning its document as a lease with option to purchase, Vision continued to describe its contracts, both to its potential investors and potential homebuyers, as similar to a land contract.

60.     The form LOP contract used by Vision beginning in mid-2013 stated that the lease and option period ran for seven years, and at the end of that seven-year term, if the homebuyer is still complying with all requirements, the contract "shall" convert to a seller-financed land contract. Vision included two other possible "options" that could potentially occur at the end of the seven-year period: the homebuyer could elect to prepay the balance owed, or could ask to be allowed to walk away from the home and forfeit all prior investments and payments.

61.     The three purported "options" listed in the contract create a false impression of choice. Option two, the right to prepay the remaining purchase price at any time with cash or outside financing, typically exists in a land contract or any home purchase transaction.

62.     Option three, "option to forfeit lease," says that the lessee may, "by mutual agreement between LESSOR and LESSEE, as evidenced in writing," forfeit their rights to the home and move out. This is the only "option" that requires Vision's written agreement. If Vision did not agree, arguably the homebuyer would be bound to continue in the LOP, which would then automatically convert to a seller-financed

land contract.

63.     This seller-financed land contract would then be governed by terms that Vision had not disclosed to the homebuyer. Although the automatic conversion is meant to be documented by a separate instrument, nothing in the LOP contract states that the homebuyer would have any choice to decline the conversion to a land contract.

64.     The description of three purported "options" that a homebuyer can "elect" appears designed to obscure the automatic nature of the conversion to a land contract at the seven-year mark.

65.     In its internal accounting, Vision calculated the terms of each of its home purchase transactions, even those it called an LOP, with a certain interest rate and repayment term (typically 15, 20, or 30 years) that would apply to the full transaction, starting during the seven-year "lease" term and continuing after the automatic conversion to a land contract. The amount of the monthly payment that was applied towards the purchase price each month during the 84-month "lease" term reflects the effective interest rate and amortization term for the transaction.

66.     Internally, Vision continued to record and track the progress of homebuyers in lease-option agreements in the same way one would track progress on a land contract or other financing arrangement—including the original principal balance, remaining principal balance, interest rate, and escrow balance for the

payment of taxes and insurance.

67.     Vision set the monthly payment and amount of the payment being credited to the purchase price so that at the seven-year mark, a homebuyer who was still making monthly payments would transition seamlessly to a seller-financed land contract.

68.     Although Vision internally tracked its transactions as 20- or 30-year land contracts, and described them this way to investors, it advertised the transaction to homebuyers as a seven-year contract, causing confusion for homebuyers. Most homebuyers believed the seven-year option period was the full payment term and they would own the home outright at the end of seven years if they had made all of their contractual payments. This belief was expressed by homebuyers in Michigan as well as in other states. Vision sales representatives reinforced this belief with specific comments and assurances. Some homebuyers recalled being told that after 84 payments, the house would be theirs, and that they would have the deed to the property free and clear after seven years. Others recalled that Vision's sales pitch made them believe their full monthly payment was going towards the purchase price, and that they would have finished paying for the home by the seven-year mark.

69.     Vision's lease-option contract did not disclose the true number of years of payments that would be required to pay for the home. Nor did the contract disclose the interest rate for the transaction. Vision's form contracts stopped specifying this

information when it shifted to styling its transactions as seven-year lease-options rather than standard land contracts. In an overt loan transaction, the interest rate and finance charge are required to be disclosed clearly and conspicuously, and most land contracts state the interest rate being charged and how long homebuyers will be paying for the home. Yet Vision's lease-option documents that it provided to homebuyers omitted this information.

70.     In its internal accounting, however, Vision calculated the amortization of its home purchase transactions using interest rates ranging from 7 to 10%, and most often above 8%, and repayment terms of 180 to 360 months. This high interest rate and long repayment term—both undisclosed to homebuyers—meant that only a small portion of each monthly payment was credited toward the purchase price. Homebuyers were surprised to discover that at the end of the seven-year period, their principal balance was nearly unchanged from the original purchase price despite years of payments.

71.     Although the lease-option contract specified the small amount of each monthly payment that went toward the purchase price, this information was not accompanied by disclosure of the interest rate or amortization term that could have made clear the implications for the homebuyer. In addition, Vision's sales representatives did not explain or reinforce this fact, and in the case of some Named Plaintiffs, Vision representatives gave oral representations that contradicted it,

giving the impression that seven years of payments would pay off the home in full.

72.    Even the undisclosed interest rate did not reflect the true cost of the credit Vision was extending to homebuyers. Vision typically offered two purchase prices: a lower cash price, and a higher price to purchase a home on credit. By doing so, Vision incorporated an additional financing charge into its transactions.

73.    In addition, Vision collected an escrow payment from the homebuyers to cover the property taxes, but failed to conduct an annual escrow review to determine if they were collecting too much money. In many instances, Vision was collecting far more from the homeowner than was needed to cover the property taxes. This over-collection of property taxes amounts to an additional finance charge, further increasing the cost of credit.

74.    Vision failed to disclose orally to homebuyers the tiny portion of their monthly payment being applied to the purchase price, failed to disclose that they would still owe a significant principal balance (almost all of the original purchase price) at the seven-year mark, failed to disclose the interest rate it used to calculate the monthly payment, and failed to disclose the effective interest rate for the transaction based on the marked-up price for a home purchased on credit.

75.    Vision's website and marketing documents describe its lease-option program as providing "the opportunity to build equity in a home without the need for a loan." In fact, Vision's homebuyers were not building equity. Vision evicted

people when they defaulted on the payments, rather than carrying out a foreclosure sale. After being evicted, Vision's homebuyers did not receive compensation for the value of any investments they made in the home or any equity Vision promised they would build.

76.    Vision also deliberately marketed its program to individuals with limited or scarred credit histories who had been unable to obtain the dream of homeownership. It specifically marketed its program as a way to help individuals "build future investment value and build credit history." Yet Vision did not actually report homebuyers' on-time payments to the credit agencies, because avoiding credit reporting helped Vision to fly "below the radar of being a 'regulated lender'" (according to a June 2012 internal email stating this was "important to the business model").

77.    Vision told potential customers on its website that "[o]ver the last 4 years, our unique [rent-to-own] program has helped thousands of families across America realize that home ownership is an option available to them and is possible."

78.    Vision failed to disclose to potential customers that almost no one entering into its contracts had succeeded in becoming a homeowner. For example, in Pennsylvania, where Vision also operated, according to data obtained by the Attorney General of Pennsylvania, out of approximately 450 homebuyers who had entered into Vision's lease-option agreement between 2013 and 2016, only 2% had

successfully obtained a deed to the home, and only 25% of the agreements were still in effect as of March 2019. The remaining 73% of agreements had been terminated through either an ejectment, eviction, or the homebuyer giving up and moving out. Of 170 homebuyers who had entered into a lease-option with Vision from 2016 to the present in Pennsylvania, only 0.5% had been successful in obtaining ownership of the home, and only 40% of the leases were still in effect as of March 2019.

79.     On information and belief, Vision's transactions in Michigan have a similar failure rate and a similarly insignificant number of transactions leading to true ownership. In Wayne County, from 2011 through early 2020, Vision entities had filed over 150 eviction and forfeiture lawsuits against Vision homebuyers in home purchase transactions.  This figure likely underestimates the number of Wayne County homebuyers who failed to achieve homeownership under a Vision contract. On information and belief, many homebuyers moved out of Vision homes without the need for an eviction filing, after learning of the terrible condition of the property upon obtaining possession or being unable to afford both the repairs and monthly payments.

80.     In Genesee County, from 2013 to 2020, Vision has filed approximately 70 eviction and forfeiture lawsuits. The number of eviction and forfeiture lawsuits likely underestimates the number of Genesee County homebuyers who failed to achieve homeownership under a Vision contract. On information and belief, many

26

homebuyers moved out of Vision homes without the need for an eviction filing, after learning of the terrible condition of the property upon obtaining possession or being unable to afford both the repairs and monthly payments.

81.     Despite the fact that Michigan law requires sellers to use a statutory process for termination of a land contract, which includes a statutory right to redeem and a pre-suit right to cure, Vision has repeatedly attempted to dispossess purchasers through a summary eviction process.

82.     In addition to masking the true cost of its alternative financing arrangement and attempting to evade regulation by captioning the documents as a lease-option, Vision hid significant defects in the properties from its prospective homeowners.

83.     Vision's business model involves purchasing formerly foreclosed homes that are often in extremely poor, even uninhabitable, condition. Nearly all of the properties Vision buys have been vacant for a period of time after foreclosure and are marked by conditions typical of vacancy, including disconnected utility service, poor weatherization, and damaged and leaking pipes.

84.     Vision makes no repairs to its properties before selling them through its home purchase contracts. As specified in its contracts, all properties are sold in "as is" condition. Many of the properties Vision sells have torn-out electrical wiring, missing or non-functioning appliances, missing or damaged plumbing, missing

toilets or other fixtures, water-damaged and deteriorating wood siding, other water damage, and mold damage. Key systems such as electrical, plumbing, and HVAC systems are often not functioning. Some homes have floors that are collapsing or roofs that leak badly. Many have raw sewage backing up in the home because of plumbing lines in need of a significant overhaul.

85.     Vision routinely obtained a full inspection of its properties with detailed information and pictures. However, it did not provide those inspection reports to buyers. Instead, it directed homebuyers to conduct a "self-inspection" of the home. Many of Vision's properties contain hidden defects, such as nonfunctioning hot water heaters, furnaces, or HVAC systems, which homebuyers could not detect in advance because utility service was not turned on at the time they viewed the property. Therefore, homebuyers were unaware of significant defects in the homes.

86.     It was routine practice for Vision to sell a home that it knew was not habitable to a homebuyer that Vision knew or should have known lacked the financial capacity to make the necessary repairs to render it habitable.

87.     It was common in Vision's transactions for homebuyers to sign a home purchase contract and begin making payments, but to be unable to occupy the home because it was not habitable and required significant repairs before the city would turn on utility service.

88.     Vision's contract stated that the homebuyer was taking on the burden

of making the home habitable, and a failure to bring the home into habitable condition within three months could result in Vision declaring the homebuyer to be in breach of the contract. The contractual requirement to bring the home into habitable condition gave Vision the ability to find a basis to terminate the contract at will.

89. A homebuyer's eventual inability to complete the purchase of a home or continue to make payments meant that Vision would recover a property that was typically in much better shape than it was when Vision induced the homebuyer to enter the transaction.

90. Vision misrepresented the nature of the agreement, the cost of the credit it was extending, the condition of the properties (by failing to disclose defects that were known to Vision), and the fact that it was offering people a pathway to homeownership.

91. Vision failed to disclose to homebuyers that it was in fact charging a finance charge in the transactions, that the high cost of credit would result in the buyer accumulating almost no reduction in the purchase price by the end of seven years, that its business model had astronomical failure rates, that the contracts were unaffordable (especially when factoring in the cost of necessary repairs), that it was not helping homebuyers to build up their credit history, and that in the end, nearly everyone entering into Vision's home purchase transactions would lose a significant

amount of personal investment, while gaining no significant benefit.

92.     Vision continues to operate its home purchase business model in Michigan by enforcing and collecting payments on the contracts. Vision continued to originate new predatory home purchase transactions in Michigan into 2019.

93.     In sum, Vision's program was designed to induce low-income homebuyers with few other options to invest significant money and make significant improvements to a home that, in all likelihood, they would never own.

94.     Far from being a responsible provider of an alternative pathway to homeownership, Vision's practices have exacerbated economic stagnation and blight in the communities it has targeted. Many of Vision's properties now sit vacant and boarded up, after Vision dispossessed unsuccessful would-be homeowners (and sometimes multiple would-be homeowners in succession) who had invested significant amounts of time and money in the homes.

### *Vision's Discriminatory Property Acquisition Strategy*

95.     Vision not only operated the predatory home purchase scheme described above, but also discriminated against Black homebuyers through its racially skewed property acquisition practices. Vision's practices both intentionally targeted Black prospective homebuyers because of their race and had a disparate impact on Black homebuyers and on residents of predominantly Black neighborhoods in the greater Detroit area. Because Vision acquired properties in

predominantly Black areas of the Detroit CSA through REO bulk sales, this caused and causes Black homebuyers to be disproportionately impacted by Vision's practices, ensnaring them in contracts with onerous and predatory terms that have led and continue to lead to their eviction and loss of their home and other harmful effects, including the inability to build equity while investing significant money into their home that could not be recouped.

96.     Vision has acquired more than 10,000 single-family homes to be sold through its home purchase program. Approximately 1,000 of these properties are located in Southeastern Michigan, in the Detroit CSA.

97.     According to data from the U.S. Census Bureau, the Detroit CSA has a population of 5.4 million. This population is 68% non-Hispanic white, 20% Black, 4% Asian, 5% Hispanic, and 2% two or more racial categories.

98.     Vision began purchasing properties in 2002 but purchased the vast majority of its properties in the aftermath of the foreclosure crisis, between 2011 and 2015. Vision chose to acquire a significant percentage of the properties from mortgage finance giant Fannie Mae's portfolio of REO properties and through other bulk REO sales.

99.     REO properties are homes that went through foreclosure but were not purchased by a third party at the foreclosure auction. As a result, they were held by the bank in its REO portfolio. These banks would later offload significant numbers

of REO properties through individual and bulk sales, often at discounted prices.

100.   Bulk REO sales are transactions in which a company sells multiple REO properties simultaneously to the same buyer, sometimes for a single combined price.

101.   Fannie Mae REO properties were homes that had been foreclosed upon, bought by the mortgage company, and then transferred to Fannie Mae because Fannie Mae owned or insured the mortgage loan that had been foreclosed.

102.   Fannie Mae bulk REO sales involved REO properties that had been listed on the market by Fannie Mae for 90 days as individual listings and had failed to sell. Fannie Mae then bundled these properties, with usually about 25 to 50 homes in a bundle, and sold them through bulk REO sales.

103.   Vision acquired the vast majority of properties for its home purchase scheme from bulk REO sales. Based on a review of public deed records from the Detroit CSA, where "bulk" REO sales were identified based on the same buyer and same seller transferring at least three properties on the same date, Vision acquired more than 70% of its properties through bulk REO sales, including from Fannie Mae.

104.   Fannie Mae bulk REO sales made up over 50% of Vision's property acquisitions in the Detroit CSA, and Fannie Mae was the single largest source of Vision's properties.

105.   Vision's general acquisition strategy was the same in all the states

where it operated. But Vision also made the deliberate decision to acquire some properties from other sellers in specific areas of the country. For example, Vision bought approximately 126 properties from the Wayne County Treasurer, although it did not buy properties from county tax foreclosures in any other counties in Michigan.

106.    The Detroit CSA overall has a 20% Black population. Yet the median racial demographic of the Census tracts where Vision acquired homes for its home purchase scheme in the Detroit CSA was 76.78% Black.

107.    From 2011 to 2015, 63.5% of the properties Vision acquired in the Detroit CSA were in majority Black Census tracts. Only 29.3% of Vision's properties in the Detroit CSA were in majority white Census tracts.

108.    Purchasing REO properties in Southeastern Michigan would not, of itself, lead to owning a heavy concentration of homes in majority Black Census tracts. REO sales in the Detroit CSA over the 2011-2015 time period were located in Census tracts with a median racial demographic of 9.51% Black, modestly higher than the median Black population in Census tracts of non-REO arms' length sales during this period, which was 3.37% Black. This is represented in Figure 1 below.



Figure 1: Arm's length sales in 2011-2015 by Census tract Non-Hispanic Black population for the Detroit CSA. Note: REO sales include only arm's length sales and exclude sales by county treasurers, i.e., property tax sales. "Non-REO" sales are a subset of CoreLogic-defined arm's length sales excluding REO sales. Sources: CoreLogic, American Community Survey 2015 5-year estimates.

109.   However, Vision's practice of acquiring properties through REO *bulk sales*—primarily through purchasing large numbers of REO properties from higher volume sellers—did result in its properties being heavily concentrated in majority Black neighborhoods to which Vision then marketed its contracts. As represented in Figure 2 below, REO bulk sales are far more racially concentrated, being located in Census tracts with a median racial demographic of 77.1% Black, compared with non-bulk REO sales, which are located in Census tracts that are much more likely to be majority white (median of 8.8% Black). The difference between the mean racial concentration of Census tracts where bulk and non-bulk REO sales occurred is

34

highly statistically significant. Figure 2 includes all REO sales in the Detroit CSA, including those from Fannie Mae.



Figure 2: REO bulk and non-bulk sales in 2011-2015 by Census tract Non-Hispanic Black population for the Detroit CSA. Note: Bulk sales defined as properties involved in transactions with the same seller, buyer, and sale date and more than two properties. Sources: CoreLogic, American Community Survey 2015 5-year estimates.

110.   From 2011 to 2015, 59.6% percent of bulk REO sales in the Detroit CSA were in majority Black Census tracts. Over the same period, 34.2% of bulk REO sales in the Detroit CSA were in majority white Census tracts.

111.   Examining just the universe of Fannie Mae REO sales further confirms the racial impact of Vision's practice of acquiring REO properties in bulk. Fannie Mae bulk REO sales in the Detroit CSA from 2011-2015 were located in Census tracts with a median racial demographic of 74.04% Black, compared to 8.65% Black

for Fannie Mae *non-bulk* REO sales in southeastern Michigan over the same time period. The mean, median, and distribution of these sales is shown in Figure 3 below. The difference between the mean racial concentration of Census tracts where bulk and non-bulk Fannie Mae REO sales occurred is highly statistically significant. Vision acquired 40% of its properties for its home purchase business through Fannie Mae bulk REO sales.



Figure 3: Fannie Mae bulk and non-bulk sales in 2011-2015 by Census tract Non-Hispanic Black population for the Detroit CSA. Note: Bulk sales defined as properties involved in transactions with the same seller, buyer, and sale date and more than two properties. Sources: CoreLogic, American Community Survey 2015 5-year estimates.

112. Another way to measure the racial concentration of bulk REO sales is through an odds ratio, which depicts the odds of one (independent) variable being associated with another (dependent) variable. The odds of an REO sale being part of a bulk sale (vs non-bulk) are over 5.7 times higher in a 90% Black Census tract

versus a 10% Black tract. Even when median home value is held constant, an REO sale is 2.4 times more likely to be part of a bulk sale in a 90% Black tract versus an REO sale in a tract that is only 10% Black. This is a highly statistically significant difference, even when holding constant median home values.

113.   There is perhaps no better way to depict the racial concentration of Vision's property acquisition scheme than through a map of its properties in the Detroit CSA. Figure 4 below shows the percent non-Hispanic Black households in the Detroit CSA per the 2011-2015 American Community Survey. Figure 5 shows Vision's properties in the Detroit CSA.



Figure 4: Census tract Non-Hispanic Black population in 2011-2015 for the Detroit CSA. Sources: CoreLogic, American Community Survey 2015 5-year estimates.



Figure 5: Properties purchased by VPM and Census tract Non-Hispanic Black population in 2011-2015 for the Detroit CSA. Sources: CoreLogic, American Community Survey 2015 5-year estimates.

*Vision's Marketing Scheme Targeted Black Communities*

114.   As explained above, Vision's practice of acquiring homes through REO bulk sales resulted in a racially skewed portfolio of properties that it used for its home purchase scheme. But this practice does not fully account for Vision's high concentration of homes in predominantly Black neighborhoods. This result also reflects Vision's intentional targeting of Black neighborhoods in order to attract Black customers because of their race.

115.   Vision purchased the vast majority of its properties from Fannie Mae bulk REO sales and other bulk REO sales, knowing that in Southeastern Michigan, such properties were located almost exclusively in communities that are majority Black. In continuing to purchase properties that it knew were located in majority Black neighborhoods, Vision showed a knowing, willful targeting of these communities in order to attract Black customers because of their race.

116.   Although Vision mostly purchased its properties through a similar acquisition strategy in all the states where it operated, it made a deliberate decision to purchase properties from other sellers in specific sub-geographies. For example, Vision bought approximately 126 properties from the Wayne County Treasurer, although it did not purchase properties from any other county tax foreclosures in Michigan. Because Wayne County has a much higher Black population than any other county in Michigan, and tax foreclosures in Wayne County are concentrated

in Black neighborhoods, this decision to purchase from the Wayne County Treasurer but not from other counties led to a predictable and actual concentration of homes in mostly Black neighborhoods.

117.   Vision then developed a marketing scheme for its home purchase business that predictably and actually attracted primarily Black purchasers because of their race. Specifically, Vision primarily advertised its program by putting yard signs and window signs in front of each house indicating it was for sale, quoting a low down payment and low monthly payment, and listing a phone number to call.

118.   This primary mode of advertising its home purchase transactions reached the primarily Black residents of these communities. The people likely to see these signs and call Vision were the ones walking or driving through the neighborhood. Individuals who did not live or frequent the overwhelmingly Black neighborhoods where Vision acquired its properties and located its yard signs would be very unlikely to see Vision's signs.

119.   Vision did advertise its properties through websites like Craig's List, Zillow, and its own website, but the majority of its leads came from people who saw the yard signs. Vision did not advertise through general-audience television channels, radio stations, magazines, or newspapers.

120.   Upon information and belief, Vision marketed its home purchase transactions almost exclusively in Black neighborhoods in order to attract Black

customers because of their race. Upon information and belief, Vision did so because it knew that Black potential homebuyers had been denied access to traditional forms of mortgage credit in the aftermath of the housing crisis and believed that Black potential homebuyers could be induced to purchase properties that were in very bad condition, and to pay inflated purchase prices and very high interest rates, because these potential homebuyers believed they would not have any other way to purchase a home.

121.   Vision's business model involves targeting credit-starved Black communities for its predatory and abusive home purchase transactions because of the race of their residents. Vision's targeting of these areas has been effective precisely because these Black potential homebuyers lacked access to traditional mortgage lending, which was extremely tight over the relevant time period.

### *Less Discriminatory Alternatives That Vision Could Have Pursued*

122.   Vision's practices were arbitrary, artificial, and unnecessary because it had an array of less discriminatory alternatives that would have served any legitimate business purpose equally well.

123.   Fannie Mae bulk REO sales, and bulk REO sales generally, were far from the only option available to Vision for acquiring single-family homes during the relevant time period.

124.   Even if Vision made a decision to purchase its stock of homes for its

home purchase scheme from REO supplies, which were prevalent in the 2011 to 2015 timeframe when Vision was ramping up its volume, Vision could have acquired REO properties in much more racially diverse neighborhoods by avoiding bulk sales and purchasing from the ample supply of properties available through non-bulk REO sales. Between 2011 and 2015, most REO sales in the Detroit CSA were not sold in bulk; during this period there were 92,841 properties sold in REO non-bulk sales, compared to only 5,140 properties sold via REO bulk sales. But the odds of a property being included in a bulk sale are substantially higher in majority Black neighborhoods. *See* Figures 2 and 3 above. Even holding median home value constant, an REO sale is 2.4 times more likely to be part of a bulk sale in a 90% Black tract versus an REO sale in a tract that is only 10% Black. By choosing to acquire the vast majority (72%) of its properties through REO bulk sales, Vision substantially increased the likelihood that its properties would be concentrated in majority—and even supermajority—Black neighborhoods despite the availability of properties of comparable home value in other neighborhoods. Upon information and belief, Vision structured its business practices in order to attract Black potential homebuyers because of their race.

125.  Vision could have marketed its home purchase product in a way that would have been less likely to impact primarily Black homebuyers by relying predominantly on forms of advertising with a broader homebuyer base, such as

general-audience television channels, radio stations, magazines, or newspapers.

126. Vision could have structured its contracts in a way that was not built to fail, and could have ceased its practices that were unfair, deceptive, and predatory, including attempting to evade consumer protections applicable to home financing transactions, masking the cost of the credit it was extending, marking up the price of homes dramatically, selling homes in terrible condition in such a way that homebuyers could not detect the significant defects, and failing to tell homebuyers of the high failure rates of its home purchase transactions.

127. Knowing that the properties it acquired in Southeast Michigan were concentrated in densely Black neighborhoods, Vision still chose to advertise predominantly through yard signs at the properties and to target the residents of these neighborhoods.

### *Role and Involvement of Atalaya and ACM Vision V*

128. Vision's actions described above, in the design, implementation, and expansion of its LOP program, were possible only because of the funding it received from Atalaya Capital Management, LP ("Atalaya"). Atalaya provided financing to VPM and its Affiliate Defendants in order to operate the LOP scheme at issue in this case.

129. VPM approached Atalaya in 2012 to be a potential lender to fund its acquisition of properties through bulk transactions for its LOP program, including

properties in Michigan.

130.   Atalaya is a privately held, SEC-registered alternative investment advisory firm. According to the New York Times, it is a hedge fund worth $5 billion.

131.   Atalaya's website describes one of its lines of business as "specialty finance," described as "originating asset-based loans to specialty finance lenders" and "purchasing whole loans or participations from credit originators." Its other classes of investments include real estate and corporate investments.

132.   Before engaging in any investment, Atalaya engages in due diligence.

133.   VPM approached Atalaya as a funder specifically to enable it to acquire properties through the bulk REO sales described above. As discussed below, Atalaya received detailed information about VPM's business model. Atalaya knew about VPM's acquisition strategy and knew that it was providing financing for the bulk acquisition of REO properties from agencies of the US government and quasi-government agencies. Atalaya knew that these properties would then be sold through VPM's LOP program to credit-starved homebuyers, and Atalaya helped develop that program.

134.   In May 2012, VPM sent an email soliciting an investor which explained VPM's business model as follows: "Based on great relations with Fannie, Freddie, FHA and ResCap, etc., Vision buys pools of foreclosed low-end houses… and sells or leases them long-term. As an example, a home will be bought for $10,000 and

sold in a few months for $40,000 or put out on a [contract for deed] with [an unpaid principle balance] of $45,000 and an implied interest rate of 8.25%." On information and belief, this email was sent to Atalaya. Vision approached Atalaya as a major potential funder in 2012, and Atalaya began funding VPM's property acquisitions in 2013.

135.   In this email, VPM went on to represent to its investor that not only was the business profitable, but it was the only way to profit from severely distressed foreclosed homes, allowing VPM to "sell low to mid-tier assets previously thought to be unsellable," homes that "most banks and lending institutions can't give away."

136.   Prior to investing, Atalaya consulted with VPM regarding the form of the agreement that VPM would enter with consumers, the LOP agreement.

137.   According to findings made in the public record by the New York Attorney General and Department of Financial Services after an investigation (the "New York findings"), Atalaya consulted with VPM regarding the terms and structure of its LOP form agreement, obtained tax opinions that shaped how Vision structured the LOP agreement, and received financial records that showed how VPM internally tracked its contracts in a manner similar to a land contract, internally recording the interest rate and true duration of the loan, information not disclosed to homebuyers in the LOP contract.

138.   Thus, according to the New York findings, Atalaya "had knowledge of

the terms of Vision's LOP agreements and how they were priced, accounted for and, at a high level, represented to consumers." Atalaya "funded Vision's property acquisitions and helped to structure the LOP agreement," thereby providing "substantial assistance" in carrying the unfair and deceptive conduct at issue.

139.   According to the New York findings, Atalaya "received regular reporting regarding Vision's business from Vision's owners and senior management," "reviewed the performance of the properties sold by Vision," and "conducted due diligence on Vision's operations." On information and belief, Atalaya's review of information would have included information related to VPM's marketing and advertising practices.

140.   According to the New York findings, Atalaya management was, in some instances, included in emails regarding individual properties and participated in decisions regarding modifications to contracts that were in default.

141.   According to the New York findings, Atalaya either was aware, or should have been aware, that VPM "was engaged in an illegal, predatory mortgage lending business," but nonetheless "agreed to fund property acquisitions by Vision, and thereby help Vision expand its operations."

142.   According to the New York findings, based on its knowledge of VPM's business operations, Atalaya knew or should have known that Vision entered into transactions with consumers who were unlikely to be able to afford the ongoing

monthly payments along with the costs of repairing properties, and without assessing consumers' ability to repay the loans while making the required repairs.

143.   According to the New York findings, Atalaya knew that VPM's LOP agreement was structured to require consumers to give up any equity they had built up in the property upon default.

144.   According to the New York findings, Atalaya knew that Vision did not report payments consumers made under the LOP agreements to credit reporting agencies—despite representing to homebuyers that its program would help build their credit history—because VPM was trying to evade regulators. Vision wrote in a June 2012 email that its practice of not reporting to credit agencies kept it "below the radar of being a 'regulated lender,' which is important to the business model."

145.   Atalaya was VPM's most significant funder during the period of time when it was acquiring the vast majority of the inventory for its LOP business. For example, in New York, Atalaya's financing was used to acquire 110 residential properties. VPM engaged in roughly 150 transactions with consumers in New York.

146.   Atalaya's funding of VPM's business model was secured by collateral, including the properties VPM owned. Atalaya received information about these properties, to ensure adequate collateral value for its debt financing. Upon information and belief, this information included the addresses or geographic location of the properties.

147.   Based on information uncovered by regulators in New York, Wisconsin, and Pennsylvania, as well as Plaintiffs' investigation in this case, VPM operated similarly in all states where it acquired properties.

148.   VPM's business model involved seller financing. This meant that rather than advancing funds for the purchase of a home from a third-party seller, VPM as the seller of the property agreed to defer payment of the full purchase price in exchange for a buyer's stream of payments over time. Because Atalaya funded VPM's acquisition of the homes, Atalaya also acted as a lender by providing the source of capital and benefiting from the stream of payments over time.

149.   Atalaya became further enmeshed in VPM's LOP program by pursuing ownership of a subset of properties subject to LOP contracts. Atalaya created Defendant ACM Vision V LLC, a real estate investment trust (REIT), to hold title to numerous inhabited homes and become a counterparty on the associated LOP contracts. ACM Vision V is one of the Affiliate Defendants described above in Section III.

150.   ACM Vision V purchased LOP contracts that had been originated by Vision entities (other Affiliate Defendants) in various states. As such, it was the assignee of these LOP contracts and became the record owner of the real estate, subject to the purchaser's contract to buy. Thus, ACM Vision V knew or should have known of the predatory terms of those contracts. Over time, ACM Vision V

purchased properties from VPM affiliates, including at least 70 properties from VPM affiliates in the Detroit CSA.

151.   According to county records, ACM Vision V held properties it had acquired from Vision until at least 2020.

152.   Some of the properties ACM Vision V sold were occupied by consumers in active LOP contracts. Others were sold as unoccupied REO property after a consumer unsuccessfully attempting to purchase the home through a LOP contract had been dispossessed.

153.   Court records reflect at least six evictions filed by ACM Vision V in Wayne County and at least eight in Genesee County. These numbers would not include any evictions filed by VPM as servicer for ACM Vision V, nor any homebuyers that left properties without an eviction being filed.

154.   Figure 6 below is a map of the VPM properties that were acquired by ACM Vision V in the Detroit CSA, over the percent Non-Hispanic Black residents by Census tract. Figure 6 shows that many of the properties owned by ACM Vision V were located in majority Black communities, a pattern consistent with Vision's racially skewed acquisition practices.



Figure 6: VPM Properties purchased by ACM Vision V, LLC and Census tract Non-Hispanic Black population in 2011-2015 for the Detroit CSA. Sources: CoreLogic, American Community Survey 2015 5-year estimates.

*Successor Defendants*

155.   According to FTE's December 2019 Form 8-K disclosure to the U.S. Securities and Exchange Commission, on December 20, 2019, FTE and US Home Rentals entered into a purchase agreement with Antoni Szkaradek, Alexander Szkaradek, VPM, VPM Holdings, and other Vision entities, whereby FTE and US Home Rentals agreed to purchase all of the equity interests in the Vision entities, including Defendants VPM, VPM Holdings, Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RVFM 4, LLC, DSV SPV 1, LLC, DSV SPV 2, LLC, DSV SPV 3, LLC, Boom SC, and Alan Investments III, LLC, all of VPM's assets that are related to its business, and any and all contracts, intellectual property, liabilities, and a real estate asset portfolio consisting of 3,184 rental homes located across the United States, among others.

156.   FTE and US Home Rentals agreed to acquire these equity interests, assets, and liabilities for aggregate consideration of $350 million consisting of $10 million in cash, $80 million in indebtedness of the Vision entities, 4,222,474 shares of FTE common stock valued at $32 million, and newly designated shares of FTE preferred stock valued at $228 million.

157.   Potential liabilities arising from the current Complaint were not disclaimed in the parties' purchase agreement. The only liabilities excluded from the purchase agreement are: (a) indebtedness of the sellers other than debt of the

companies themselves or debt expressly assumed by the agreement, (b) liability related to the excluded assets, (c) liability related to current or pending action against the companies as of December 2019, (d) tax liability arising from the companies, (e) intercompany accounts payable, (f) transaction expenses, (g) retained bonuses, and (h) additional liabilities listed in the Schedules which Plaintiffs do not have access to.

158.   FTE's December 2019 Form 8-K disclosure attached a copy of the purchase agreement but did not include all schedules referred to in the agreement.

159.   FTE published a press release announcing its merger with Vision and stated: "Vision's management team . . . will continue as senior executives of the Company and major shareholders." Alex Szkaradek, Vision's CEO, hailed the transaction as a "strategic partnership."

160.   Upon information and belief, FTE directed the purchase of Vision and its business.

161.   Antoni Szkaradek, Alexander Szkaradek, VPM, VPM Holdings, and other Vision entities own 19.9% of FTE's currently outstanding common stock and additional preferred stock of FTE.

162.   FTE and US Home Rentals are continuing Vision's business model and operations.

163.   Pursuant to the purchase agreement, the Vision entities were required to conduct their business in its ordinary course before and until the close of the agreement, preserve the present business operations, assets, organizational structure, stocks, and goodwill, because FTE and US Home Rentals would assume those business interests and operations upon closing.

164.   The Vision entities transferred all of its residential properties, current and form contracts, intellectual property, employees, employee benefit plans, and business infrastructure to FTE and US Home Rentals.

165.   There was an almost seamless transition between Vision and FTE and US Home Rentals from the perspective of the homebuyers. Plaintiff Henderson remembers being unable to reach Vision at the phone number she regularly calls to make her payments. However, after a couple months of not being able to reach Vision, she called the same number again and a representative told her that the company changed its name to US Home Rentals and proceeded to take her payment. The representative did not require Ms. Henderson to submit any new information to continue her relationship with them.

166.   Homebuyers send their monthly payments to the same addresses and use the same phone number to reach US Home Rentals as they did when the company was operating under the name Vision.

167.   After purchasing and operating Vision's business for approximately one year, FTE announced in December 2020 that it will be assuming the name of its principal subsidiary, US Home Rentals, and exclusively operating and expanding that business model.

168.   FTE recently filed a document with the SEC stating that the wholly owned subsidiaries of US Home Rentals which were acquired from VPM, the entities which hold title to the properties, have taken out a loan for $1.4 Million which will be used to rehabilitate the properties and pay property taxes. FTE guaranteed the loan.

169.   Michael P. Beys was the interim Chief Executive Officer of both FTE and US Home Rentals at the time of execution of the purchase agreement.

170.   Upon information and belief, US Home Rentals is a shell corporate structure and is an alter ego of Defendant FTE.

## V.   EXPERIENCES OF THE NAMED PLAINTIFFS

### A.   *Rhonda Henderson*

171.   Rhonda Henderson is a fifty-six-year-old Black woman who lives with her husband Rodney Palmer in Inkster.

172.   Ms. Henderson and Mr. Palmer have lived in their home in Inkster since Ms. Henderson entered into a home purchase contract with Vision in 2014.

173. Ms. Henderson learned about Vision from its website and from yard signs and window signs in houses all over Inkster advertising homes for sale for as little as $300 down.

174. Ms. Henderson was tired of renting and eager for the opportunity to own her own home with Mr. Palmer. The house they had been renting immediately before learning about Vision had a number of problems and needed long-overdue repairs.

175. When Ms. Henderson looked at the homes listed on Vision's website, Vision provided a lockbox code and instructed her to go and view the house on her own. No Vision representative ever met with her in person. Ms. Henderson and Mr. Palmer viewed several properties owned by Vision, many of which were in terrible condition.

176. Vision was offering the house for $40,000 if purchased through Vision's LOP program. This is the price for the property as stated in Ms. Henderson's contract with Vision, as described below. Ms. Henderson does not recall whether Vision was offering a lower cash price if she could have paid it all in a lump sum.

177. Unbeknownst to Ms. Henderson, Vision, through its related entity Kaja Holding 2, LLC, had purchased the property from the Wayne County Treasurer for $7,300 approximately seven months before it sold the home to her for $40,000, a

more than five-fold markup. Upon information and belief, Vision did not make any repairs or improvements to the property before entering the contract to sell it to Ms. Henderson for over five times what Vision had paid for it.

178.   When she and Mr. Palmer viewed the home, Ms. Henderson thought the condition of the home looked better than many of the other properties. The rugs were badly pet soiled, the smell was terrible, there was trash and debris throughout the home, and an eviction notice had been placed on the back door. But other than a deep cleaning, she thought the home was in decent condition.

179.   After moving into her home, Ms. Henderson discovered that the electricity was not working in half of the house, that a plumbing issue prevented one bathroom in the basement from being usable, and that the hot water heater needed repair. Over time, she replaced the kitchen cabinets and countertops, pulled out carpets and refinished floors, and painted the house inside and out.

180.   Ms. Henderson was working as a home health care worker at the time that she entered into the contract with Vision. Vision told Ms. Henderson that she didn't make enough to qualify on her own, and she would have to obtain a co-signer. Since Mr. Palmer was out of work at the time, she did not include him as a co-signer. Her daughter Kiara Henderson, who was working for McDonalds, was willing to be added as a cosigner.

181.   On information and belief, Vision did not verify Ms. Henderson's

ability to afford the obligations of the contract, especially considering her other expenses, full debt-to-income ratio, and the cost of repairs necessary to bring the home into habitable condition.

182.   Ms. Henderson has no professional experience in finance, home lending, or real estate.

183.   Ms. Henderson never met with any Vision representative or agent in person. The closing of the transaction was conducted by mail. Ms. Henderson was asked to sign the papers in front of a notary and return them in a pre-paid envelope.

184.   At the time that the contract was entered into, Ms. Henderson was not advised nor required by Vision to obtain an inspection of the home, and Vision did not obtain an appraisal.

185.   The contract between Vision (through its related entity, Kaja Holdings 2, LCC) and Ms. Henderson is captioned "Residential Lease with Option to Purchase Agreement (Triple-Net, Bondable Lease)" and is attached as Exhibit A.
The contract was entered into on June 15, 2014.

186.   The contract stated that the purchase price was $40,000. Ms. Henderson was required to send $1,303 for a down payment and her first monthly payment. She was then required to pay $553 per month. This monthly payment included $225 per month for property taxes and $25 per month for insurance. In the middle of a paragraph the contract states that only $55.05 of this monthly payment was credited

to the purchase price each month.

187.   Despite the contract's written terms, Ms. Henderson believed based on Vision's oral representations that her entire monthly payment would go toward the purchase price of the home, and that by the end of the seven-year period, she would own the house outright.

188.   Despite the contract's written terms, Ms. Henderson did not understand, and was not informed orally by Vision's sales representative, that in fact only a small fraction of her monthly payment ($55.05 out of $553 per month) was being applied to the purchase price.

189.   She had no understanding, and was not informed (through the contract's written terms or in oral representations), that if she made every single payment on time, at the end of the seven-year term she would still owe $34,625.80 of the $40,000 purchase price.

190.   Based on the monthly payment amount and the amount being applied to the principal balance each month for the seven year "lease-option" period, Vision extended Ms. Henderson credit of $39,250 (the purchase price minus the down payment) at an 8% annual interest rate.

191.   On information and belief, Vision calculated Ms. Henderson's monthly payment based on a principal balance of $39,250, an interest rate of 8%, and a payment term of 300 months (25 years). On information and belief, Vision intended

to convert Ms. Henderson to a land contract with a 25-year term (with 18 years remaining) after the initial 7-year period.

192. Vision never disclosed to Ms. Henderson, through its written contract or in oral representations, that she was being charged an 8% annual interest rate.

193. Vision never disclosed to Ms. Henderson, through its written contract or in oral representations, that the contract had an amortization term of 300 months and a payment schedule of 300 months.

194. Vision never orally disclosed to Ms. Henderson that the payments required by her contract would not pay off the purchase price in seven years, but rather that it would take her 25 years making this payment to complete the purchase of her home.

195. Vision did not disclose to Ms. Henderson, through its written contract or in oral representations, the finance charge, annual percentage rate, the total number of payments required for Ms. Henderson to own the home, the amount of the purchase price that would be owed at the end of the seven-year period, or the fact that a security interest in the home was taken.

196. Vision has also required Ms. Henderson to pay into an escrow account that is meant to cover the property taxes for the home.

197. City and county records indicate that Vision has not paid taxes on the house timely each year. Vision has not yet paid the Winter 2018 taxes, which would

make the home eligible for tax foreclosure in 2021. Vision has not yet paid the Summer or Winter 2019 taxes, which were due by August 31, 2019 and January 31, 2020, respectively. And Vision has not yet paid the Summer 2020 property taxes, which were due by August 31, 2020. Ms. Henderson was not aware that Vision has not been making the required property tax payments on her home.

198.   Vision is requiring Ms. Henderson to pay $225 per month for property taxes, which adds up to $2,700 per year. However, Ms. Henderson's property tax bill over the past six years has averaged out to $1,974 per year. Moreover, Vision has failed to pay out for the taxes since 2018, despite collecting more than enough money from Ms. Henderson to pay her property taxes. Ms. Henderson recently received a notice of tax foreclosure for her home.

199.   The excess escrow funds Vision has required from Ms. Henderson amount to an additional hidden finance charge. Factoring in the padded escrow, Ms. Henderson's annual percentage rate was at least 9.867%. Vision did not disclose this interest rate to Ms. Henderson through its written contract or in oral representations.

200.   However, the true annual percentage rate was likely significantly higher. Vision typically offered homes for a lower cash price compared to the LOP price. Ms. Henderson does not recall that difference for her home. On information and belief, Vision charged Ms. Henderson an annual percentage rate well above 11% when factoring in the hidden finance charges of the inflated purchase price and

padded escrow charges. Vision did not disclose this interest rate to Ms. Henderson through its written contract or in oral representations. The average prime offer rate at the time of Ms. Henderson's transaction was approximately 3.73%.

201.   Vision has failed to conduct an annual escrow analysis, failed to return excess escrow surplus to Ms. Henderson, and failed to make timely payments out of escrow for the required property taxes for the home.

202.   In over six years living in this home and making payments, Ms. Henderson has never received a monthly statement from Vision or one of its affiliated LLCs. If she had received a monthly statement, including payments received by Vision and payments made out of escrow, it would have helped her to realize that Vision was over-collecting for property taxes and also was not making timely property tax payments.

203.   Ms. Henderson has been paying faithfully on the contract for over six years. She is current on her payments. She learned recently that after seven years of making payments, rather than owning the house outright, she will still owe nearly the full purchase price. Her remaining balance owed as of the filing of this action is approximately $35,600, only $4,000 less than when she started.

204.   At this point, Ms. Henderson has made this house a home and wants to continue living there with her family. She has invested a substantial amount of her income and labor into it. She has paid Vision roughly $40,000 in payments over this

time period; yet according to Vision, she still owes over $35,000 of the purchase price.

**B.** *Roberta Faulks*

205.   Roberta Faulks is a seventy-year-old Black woman who lives in Inkster.

206.   Ms. Faulks has lived in her home in Inkster since entering into a home purchase contract with Vision in 2016.

207.   Ms. Faulks found Vision while researching rent-to-own homes in Inkster.

208.   When Ms. Faulks looked at the homes listed on Vision's website, Vision provided a lockbox code and instructed her to go and view the house on her own. No Vision representative ever met with her in person.

209.   The house was listed by Vision as being for sale for $44,900 if purchased through Vision's LOP program. This is the price for the property as stated in Ms. Faulks's contract with Vision, as described below. Ms. Faulks does not recall any cash price Vision was asking for the home.

210.   Unbeknownst to Ms. Faulks, Vision, through its affiliated entity Kaja Holdings 2 LLC, had purchased the property from the Wayne County Treasurer for $8,200 approximately two years prior to selling it to her for $44,900, a more than five-fold markup. Upon information and belief, Vision did not make any repairs or improvements to the property before entering the contract to sell it to Ms. Faulks for

over five times what Vision had paid for it.

211.   After signing the contract and moving in, Ms. Faulks learned the electricity needed to be grounded and rewired. There was damage around the chimney that caused water to leak into the basement. The house's flooring was also damaged, and Ms. Faulks had to clean and varnish it. She also had to replace the hot water heater.

212.   Despite the many repairs Ms. Faulks has already made to her home, there is still much work to be done. The kitchen floor is separating, the roof is leaking, the plumbing backs up with water when she runs the dishwasher, and the windows need to be replaced.

213.   Before retiring, Ms. Faulks was a civil servant who worked for the state's mental health services and as an officer for the state department of corrections. She has no professional experience in finance, home lending, or real estate.

214.   When she applied to purchase the home from Vision, Ms. Faulks's income was roughly $1,400 per month in Social Security benefits.

215.   On information and belief, Vision did not verify Ms. Faulks's ability to afford the obligations of the contract, especially considering her other expenses, full debt-to-income ratio, and the cost of repairs necessary to bring the home into habitable condition.

216.   Ms. Faulks never met with any Vision representative or agent in person. The closing of the transaction was conducted by mail. Ms. Faulks was asked to sign the papers in front of a notary and return them.

217.   Ms. Faulks was not advised nor required to obtain an inspection of the home before entering into the contract, and Vision did not obtain an appraisal.

218.   The contract between Vision (through its related entity, Kaja Holdings 2, LLC) and Ms. Faulks is captioned "Residential Lease with Option to Purchase Agreement (Triple-Net, Bondable Lease)" and is attached as Exhibit B. The contract was entered into on May 15, 2016.

219.   The contract stated that the purchase price was $44,900. Ms. Faulks was required to send $1,770 for a down payment and her first monthly payment. Her initial payment was $520 (it has since increased to $535) per month. This monthly payment included $125 per month for property taxes and $30 per month for insurance.  In the middle of a paragraph the contract states that only $98.96 of this monthly payment was credited to the purchase price each month.

220.   Despite the contract's written terms, Ms. Faulks did not understand, and was not informed orally by Vision's sales representative, that in fact only a small fraction of her monthly payment ($98.96 out of $520 per month) was being applied to the purchase price.

221.   Ms. Faulks had no understanding, and was not informed (through the

contract's written terms or in oral representations), that if she made every single payment on time, at the end of the seven-year term she would still owe $35,337.36 of the $44,900 purchase price.

222.   Based on the monthly payment amount and the amount being applied to the principal balance each month for the seven year "lease-option" period, Vision extended Ms. Faulks credit of $43,650 (the purchase price minus the down payment) at an 8% annual interest rate.

223.   On information and belief, Vision calculated Ms. Faulks's monthly payment based on a principal balance of $43,650, an interest rate of 8%, and a payment term of 240 months (20 years). On information and belief, Vision intended to convert Ms. Faulks to a land contract with a 20-year term (with 13 years remaining) after the initial seven-year period.

224.   Vision never disclosed to Ms. Faulks, through its written contract or in oral representations, that she was being charged an 8% annual interest rate.

225.   Vision never disclosed to Ms. Faulks, through its written contract or in oral representations, that the contract had an amortization term of 240 months and a payment schedule of 240 months.

226.   Vision never orally disclosed to Ms. Faulks that the payments required by her contract would not pay off the purchase price in seven years, but rather it would take her 20 years making this payment to complete the purchase of her home.

227.   Vision did not disclose to Ms. Faulks, through its written contract or in oral representations, the finance charge, annual percentage rate, the total number of payments required for Ms. Faulks to own the home, the amount of the purchase price that would be owed at the end of the seven-year period, or the fact that a security interest in the home was taken.

228.   Vision has also required Ms. Faulks to pay into an escrow account that is meant to cover the property taxes for the home.

229.   City and county records indicate that Vision has not paid taxes on the house timely each year. Vision has not yet paid the Summer or Winter 2019 taxes, which were due by August 31, 2019 and January 31, 2020, respectively. And Vision has not yet paid the Summer 2020 property taxes, which were due by August 31, 2020. Ms. Faulks was not aware that Vision has not been making the required property tax payments on her home.

230.   Vision is requiring Ms. Faulks to pay $125 per month for property taxes, which adds up to $1,500 per year. However, Ms. Faulks's property tax bill over the past six years has averaged out to $1,431 per year. Moreover, Vision has failed to pay out for the taxes since 2019, despite collecting more than enough money from Ms. Faulks to pay her property taxes.

231.   The excess escrow funds Vision has required from Ms. Faulks amount to an additional hidden finance charge. Factoring in the padded escrow, Ms. Faulks's

annual percentage rate was over 8%. Vision did not disclose this interest rate to Ms. Faulks through its written contract or in oral representations.

232.   However, the true annual percentage rate was likely significantly higher. Vision typically offered homes for a lower cash price compared to the LOP price. Ms. Faulks does not recall that difference for her home. On information and belief, Vision charged Ms. Faulks an annual percentage rate well above 11% when factoring in the hidden finance charges of the inflated purchase price and padded escrow charges. Vision did not disclose this interest rate to Ms. Faulks through its written contract or in oral representations. The average prime offer rate at the time of Ms. Faulks's transaction was approximately 3.28%.

233.   Vision has failed to conduct an annual escrow analysis, failed to return excess escrow surplus to Ms. Faulks, and failed to make timely payments out of escrow for the required property taxes for the home.

234.   In four years living in this home and making payments, Ms. Faulks has never received a monthly statement from Vision or one of its affiliated LLCs. If she had received a monthly statement, including payments received by Vision and payments made out of escrow, it would have helped her to realize that Vision was over-collecting for property taxes and also was not making timely property tax payments.

235.   On information and belief, Vision has never reported the payments to

the credit bureaus and is not helping her improve her credit.

236.   Ms. Faulks has been paying faithfully on her Vision contract for four years. She recently learned that after seven years of making payments, she will still owe nearly $35,500, more than three-quarters of the purchase price.

237.   At this point, Ms. Faulks has invested a significant amount of money into this home, with the risk of losing it all. She now realizes Vision is still claiming she owes a significant balance. She fears being unable to sell the home if she ever needs to move into an apartment due to her physical needs as she ages.

## C.    *Rachel Church*

238.   Rachel Church is a thirty-four-year-old white woman who lives with her fiancé, Tyler Sturgeon, and their two children at their home in Mt. Morris.

239.   Ms. Church has lived in her home in Mt. Morris since entering into a home purchase contract with Vision in 2015.

240.   Ms. Church found out about the opportunity to purchase a home from Vision when she saw a yard sign in front of a house in Mt. Morris.

241.   Ms. Church had never owned a home before. She had been renting a mobile home immediately before entering the contract with Vision and wanted to own a home where her children could play outside.

242.   She reviewed a list of properties Vision had available for purchase and looked at several homes, including the home she decided to purchase.

243.   Vision provided a lockbox code and instructed her to go and view the house. No Vision representative ever met with her in person.

244.   The house was listed by Vision as being for sale for $74,900 if purchased through Vision's rent-to-own program. This is the price for the property as stated in Ms. Church's contract with Vision, as described below. Ms. Church does not recall a lower cash price for the home.

245.   Unbeknownst to Ms. Church, Vision, through its affiliated entity Kaja Holdings 2, LLC, had purchased the property from Bank of America for $16,255 approximately three months before it sold the home to her for $74,900. Upon information and belief, Vision did not make any repairs or improvements to the property before entering the contract to sell it to Ms. Church for over 4.6 times what Vision had paid for it.

246.   When she viewed the property, Ms. Church thought the home looked like a fixer-upper with mostly cosmetic problems. She saw some mold, water damage, and holes in the wall, and the carpet needed repair.

247.   After signing the contract and moving in, Ms. Church discovered the condition of the house was much worse than she realized. The electrical system did not work and was not up to code, there was no running water because the pipes were not winterized and had burst, the furnace and water heater did not function, the foundation was crumbling, and the roof needed repairs. Since signing the contract,

she has spent at least $10,000 on repairs and materials to make the home habitable, including fixing the plumbing, redoing the floors, and fixing the furnace and water heater. Although she has purchased materials to fix the electrical system, she cannot afford the installation costs, and as a result, parts of the house still have no power. The house continues to have persistent leaks.

248.   At the time that Ms. Church was applying to purchase the home, she was making roughly $10 per hour at a manufacturing job.

249.   On information and belief, Vision did not verify Ms. Church's ability to afford the obligations of the contract, especially considering her other expenses, full debt-to-income ratio, and the cost of repairs necessary to bring the home into habitable condition.

250.   Ms. Church has no professional experience in finance, home lending, or real estate.

251.   Ms. Church never met with any Vision representative or agent in person. The closing of the transaction was conducted by mail. Ms. Church was asked to sign the papers in front of a notary and return them in a pre-paid envelope.

252.   Ms. Church was not advised nor required by Vision to obtain an inspection of the home, and Vision did not obtain an appraisal.

253.   The contract between Vision (through its related entity, Kaja Holdings 2, LLC) and Ms. Church is captioned "Residential Lease with Option to Purchase

Agreement (Triple-Net, Bondable Lease)" and is attached as Exhibit C. The contract was entered into on October 1, 2015.

254.   The contract stated that the purchase price was $74,900. Ms. Church was required to send $3,832 for a down payment and the first monthly payment. She was then required to pay $832 per month. This monthly payment included $190 per month for property taxes and $40 per month for general liability insurance. In the middle of a paragraph the contract states that only $162.73 of this monthly payment was credited to the purchase price each month.

255.   Despite the contract's written terms, Vision's sale representative led Ms. Church to believe that her entire monthly payment would go toward the purchase price of the home, and that by the end of the seven-year period, she would own the house outright.

256.   Despite the contract's written terms, Ms. Church did not understand, and was not informed orally by Vision's sales representative, that in fact only a small fraction of the monthly payment ($162.73 out of $832 per month) was being applied to the purchase price.

257.   She had no understanding, and was not informed (through the contract's written terms or in oral representations), that if she made every single payment on time, at the end of the seven-year term she would still owe $58,230 of the $74,900 purchase price.

258.   Based on the monthly payment amount and the amount being applied to the principal balance each month for the seven year "lease-option" period, Vision extended Ms. Church credit of $71,900 (the purchase price minus the down payment) at an 8% annual interest rate.

259.   On information and belief, Vision calculated Ms. Church's monthly payment based on a principal balance of $71,900, an interest rate of 8%, and a payment term of 240 months (20 years). On information and belief, Vision intended to convert Ms. Church to a land contract with a 20-year term (with 13 years remaining) after the initial 7-year period.

260.   Vision never disclosed to Ms. Church, through its written contract or in oral representations, that she was being charged an 8% annual interest rate.

261.   Vision never disclosed to Ms. Church, through its written contract or in oral representations, that the contract had an amortization term of 240 months and a payment schedule of 240 months.

262.   Vision never orally disclosed Ms. Church that the payments required by the contract would not pay off the purchase price in seven years, but rather it would take 20 years making this payment to complete the purchase of the home.

263.   Vision did not disclose to Ms. Church, through its written contract or in oral representations, the finance charge, annual percentage rate, the total number of payments required for Ms. Church to own the home, the amount of the purchase

price that would be owed at the end of the seven-year period, or the fact that a security interest in the home was taken.

264.   Vision has also required Ms. Church to pay into an escrow account that is meant to cover the property taxes for the home.

265.   City and county records indicate that Vision has not paid taxes on the house timely each year. On information and belief, Vision has not yet paid the Summer or Winter 2019 taxes, which were due by August 31, 2019 and January 31, 2020, respectively. And Vision has not yet paid the Summer 2020 property taxes, which were due by August 31, 2020. Ms. Church was not aware that Vision has not been making the required property tax payments on their home. Ms. Church is at risk of tax foreclosure in 2022 due to Vision's failure to pay the 2019 taxes, which could lead to her eventual eviction from her home.

266.   Vision is requiring Ms. Church to pay $190 per month for property taxes, which adds up to $2,280 per year. However, Vision has failed to pay out for the taxes since 2019, despite collecting this amount from Ms. Church to pay her property taxes.

267.   The true annual percentage rate in the transaction was likely significantly higher that 8%. Vision typically offered homes for a lower cash price compared to the LOP price. Ms. Church does not specifically recall whether Vision made her a cash price offer, but such an offer was Vision's typical practice. On

information and belief, Vision charged Ms. Church an annual percentage rate well above 11% when factoring in the hidden finance charges of the inflated purchase price and padded escrow charges. Vision did not disclose this interest rate to Ms. Church through its written contract or in oral representations. The average prime offer rate at the time of Ms. Church's transaction was approximately 3.45%.

268. Vision has failed to conduct an annual escrow analysis, failed to return any excess escrow surplus to Ms. Church, and failed to make timely payments out of escrow for the required property taxes for the home. Ms. Church recently received a notice of tax foreclosure for her home.

269. In nearly five years living in this home and making payments, Ms. Church has never received a monthly statement from Vision or one of its affiliated LLCs. If she had received a monthly statement, including payments received by Vision and payments made out of escrow, it would have helped her to realize that Vision was not making timely property tax payments.

270. Ms. Church has been making payments to Vision under the contract for nearly five years. At one point, she fell behind on her payments for approximately three or four months and faced aggressive threats of eviction by Vision. But she paid the overdue amount and is now current on the contract.

271. She learned after signing the contract that only a small portion of her monthly payment is being applied to the purchase price, and that after seven years

of making payments, rather than owning the house outright, she will still owe roughly $58,230.

272.   At this point, Ms. Church is unsure of her rights, frustrated by the misrepresentations and unfairness of the transaction, and believes she owes more than the home is currently worth, despite having paid nearly $50,000 in payments over the past five years.

## VI.   CLASS ALLEGATIONS

273.   Plaintiffs bring this action on their own behalf and on behalf of a class of all other persons similarly situated (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").

274.   Specifically, Plaintiffs seek to certify a Class for purposes of determining liability, as well as crafting appropriate injunctive and declaratory relief, pursuant to Rules 23(a), 23(b)(2), and 23(c)(4).

275.   Plaintiffs also bring this class action pursuant to Rules 23(a) and 23(b)(3) seeking monetary damages, disgorgement, and any other monetary relief on behalf of the Class.

276.   Plaintiffs request that this Court certify the Class of all persons who have entered into a "LOP" contract with Vision in the Detroit CSA from January 1, 2013 to December 31, 2019. All Named Plaintiffs are members of the Class they seek to represent.

277.   Plaintiffs also request that this Court certify a subclass of all Black homebuyers who have entered into a "LOP contract" with Vision from January 1, 2013 to December 31, 2019 (the "Subclass"). Named Plaintiffs Rhonda Henderson and Roberta Faulks are members of the Subclass they seek to represent.

278.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Subclass before the Court determines whether certification is appropriate.

279.   Excluded from the Class and the Subclass are:

   a) Vision Property Management, LLC; FTE Networks, Inc.; US Home Rentals, LLC; the Affiliate Defendants; Atalaya Capital Management LP; Antoni Szkaradek; Alex Szkaradek and any entities in which they have a controlling interest;

   b) Any entities in which Vision Property Management, LLC; FTE Networks, Inc.; US Home Rentals, LLC; Atalaya Capital Management LP; or the Affiliate Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Vision Property Management, LLC; FTE Networks, Inc.; US Home Rentals, LLC; Atalaya Capital Management LP; the Affiliate Defendants; Antoni Szkaradek; and Alex Szkaradek;

c) The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and

d) Any attorneys representing the Plaintiffs or the Class.

280. <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. Joinder of all Class members is impracticable because of the size of the Class. Vision acquired close to 1,000 single-family homes in the Detroit CSA from 2002 to the present and acquired the vast majority of these from 2011 to 2015. Vision was entering into LOP contracts with potential homebuyers on these properties from 2013 to 2019. Plaintiffs are informed and believe that the Class includes over a thousand homebuyers because although some properties remained vacant, other properties were involved in multiple homebuyer transactions in rapid succession over the time period of 2013 to the present.

281. <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. The claims alleged on behalf of the Class and Subclass raise questions of law and fact that are common to the Class and Subclass and predominate over questions affecting only individual members because all Class members and Subclass members entered into the same form of transaction on the basis of the same or similar misrepresentations, with the same lack of accurate disclosures regarding

the cost of credit, and involving single-family homes with the same or similar defects. Common questions of law and fact include, among others:

(i) whether Vision intentionally targeted Black homebuyers in violation of the FHA and ECOA;

(ii) whether Vision's policies and practices have a disparate impact on Black homebuyers in violation of the FHA and ECOA;

(iii) whether any disparate impact is justified by business necessity;

(v) whether Defendants failed to properly handle consumer escrow accounts for taxes and insurance as required by RESPA; and

(vii) whether the Class members are entitled to injunctive relief and statutory damages they seek.

282. <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>. The claims of the class representatives are typical of the Class because the Class representatives entered into the same type of transaction as the other Class members on the basis of the same or similar misrepresentations, with the same lack of accurate disclosures regarding the cost of credit, and involving single-family homes with the same or similar defects.

283. <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>. Plaintiffs are adequate representatives of the Class and Subclass because they fit with the Class and Subclass definition and their interests do not conflict with the interests of the members of the Class and Subclass they seek to represent. Plaintiffs are represented

by the undersigned attorneys ("Class Counsel") from well-resourced public interest organizations with decades of relevant experience. Class Counsel have litigated numerous class actions, including but not limited to civil rights, fair housing, and consumer cases brought under FHA and ECOA, among other causes of action. Class Counsel intend to prosecute this action vigorously for the benefit of the entire Class and Subclass. Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the members of the Class and Subclass.

284.  Superiority—Fed. R. Civ. P. 23(b)(3). The class action is the best available method for the efficient adjudication of this litigation because individual litigation of the Class and Subclass members' claims would be impracticable and individual litigation would be unduly burdensome to the courts due to the size of the Class and Subclass. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. As a result, a class action is superior to other available methods for fairly and efficiently adjudicating this litigation.

285.  Class Certification is appropriate under Rules 23(b)(2) and 23(c)(4) because the defendants have acted or refused to act on grounds generally applicable

to the Class and/or the Subclass, making appropriate declaratory and injunctive relief with respect to the Plaintiffs, the Class, and the Subclass.

## VII. INJURY TO INDIVIDUAL NAMED PLAINTIFFS

286. Each of the Plaintiffs has been injured by Vision's abusive contract terms. Specifically, they have spent significant amounts of money and hours of their own labor on repairs and improvements to a home that is not legally titled in their names. They have paid money for the property taxes on a property not legally titled in their names, and Vision has not even properly used that money to pay the taxes. They have been charged an inflated purchase with high finance charges. They have the risk of eviction, and in some cases threats of eviction, despite the fact they were assured they were becoming homeowners.

287. Each of the Plaintiffs has suffered significant emotional harm caused by Vision's racially discriminatory and abusive contract terms. Upon learning that they do not have the rights and protections of a homeowner, contrary to what they were told, Plaintiffs have experienced surprise, frustration, anger, and a feeling of having been duped. They have suffered anxiety knowing that they could lose their home at any moment through a summary eviction, with no opportunity to protect themselves or their hard-earned, but apparently illusory, equity in a home. They have worried over the prospect of themselves and their spouses and children becoming homeless.

288.  Vision's illegal discrimination has caused Plaintiffs to suffer irreparable loss and injury, including, but not limited to, humiliation, embarrassment, emotional distress, financial loss, and deprivation of their civil rights.

289.  None of the Plaintiffs discovered the discrimination underlying Vision's rent-to-own transactions before they consulted with an attorney no earlier than April 2020. Plaintiffs could not have reasonably discovered the discrimination independently because the information about Vision's discrimination was not known to them until explained to them by counsel.

## VIII.  CAUSES OF ACTION

### COUNT ONE
### Violation of the Fair Housing Act, 42 U.S.C. §§ 3604, 3605
### Plaintiffs Henderson and Faulks Against VPM, VPM Holdings, Atalaya, the Successor Defendants, and the Affiliate Defendants

290.  Plaintiffs Henderson and Faulks, on behalf of themselves and the Subclass, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

291.  VPM and the Affiliate Defendants acted jointly. The Affiliate Defendants were created by VPM to hold legal title to the properties acquired for Vision's predatory LOP scheme. Each of the Affiliate Defendants (except ACM Vision V, the ownership of which is described above) is owned 49.5% by Alex Szkaradek, 49.5% by Antoni Szkaradek, and 1% by VPM Holdings LLC. The

Affiliate Defendants are listed as the counter-party in every LOP contract, although Vision conducted all business on their behalf. For purposes of this Count, "Vision" refers collectively to VPM, VPM Holdings, and the Affiliate Defendants.

292.   The FHA bars practices that "otherwise make unavailable or deny" a dwelling to any person on the basis of race or other protected characteristic. 42 U.S.C. § 3604(a) ("Section 3604(a)").

293.   The FHA also prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of membership in a protected class. *Id.* at (b) ("Section 3604(b)").

294.   Additionally, the FHA makes it unlawful to discriminate on the basis of race against any person in a residential real estate transaction such as the making or purchasing of loans or providing other financial assistance. 42 U.S.C. § 3605(a) ("Section 3605"). The FHA defines such transactions as "the making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id.* at (b).

295.   Vision engaged in residential real estate transactions with respect to Plaintiffs Henderson, Faulks, and the members of the Subclass by making each of them a loan for the purchase of residential real estate.

296.   Plaintiffs Henderson, Faulks, and the Subclass are members of a

83

protected class on the basis of race under the FHA because they are Black.

297.  By the actions described throughout this Complaint, Vision has engaged in, and will continue to engage in, a practice of discrimination against Black residents of Detroit due to their race, or the racial composition of their neighborhood, in violation of the FHA. Vision's actions violated Sections 3604(a), 3604(b), and 3605 of the FHA and constitute actionable discrimination on the basis of race.

298.  Vision's discriminatory practice of acquiring properties through REO bulk sales, which are disproportionately located in majority and predominantly Black neighborhoods of the Detroit CSA, has a disproportionate and unjustified impact on Black residents.

299.  This practice caused and continues to cause a predictable and actual harmful disparate impact on Black communities and Black homebuyers, including Plaintiffs Henderson, Faulks, and the members of the Subclass. Because Vision purchased properties in predominantly Black areas of the Detroit CSA through REO bulk sales, Black homebuyers are and were disproportionately more likely to be impacted by Vision's practices, resulting in harmful effects such as eviction, loss of their home, the inability to build equity, paying an inflated purchase price and high finance charges, paying for property taxes on a home they did not legally own, and often having Vision fail to pay the taxes despite collecting for them, making significant repairs to a home they did not legally own, being told the home would be

paid for within seven years when in fact a much longer term was required, and the onerous terms required by Vision's contracts.

300.   The past and continuing acts and conduct of Vision have had and will continue to have a harmful disparate impact on Black residents of Detroit, in violation of the federally protected rights of Plaintiffs Henderson, Faulks, and the members of the Subclass.

301.  Vision's discriminatory practice is an artificial, arbitrary, and unnecessary barrier to housing. For example, Vision engaged in a practice of purchasing its properties through REO bulk sales, which substantially increased the likelihood that its properties would be concentrated in majority—and even supermajority—Black neighborhoods, despite the availability of properties of comparable home value in other neighborhoods. Thus, Vision could have operated its business without purchasing properties in predominantly Black neighborhoods.

302.  Vision's discriminatory practice is not justified by one or more substantial, legitimate, nondiscriminatory interests. To the extent Vision may claim that its practice is justified by a substantial, legitimate, nondiscriminatory interest, that interest may be achieved by less discriminatory means.

303.  Vision's practice is also intentionally discriminatory on the basis of race.

304.  Vision's contracts, as described throughout this Complaint, are unfair

and predatory. As described above, Vision's contracts obscure the high interest rate and true payment period required to complete purchase of the home. Vision led homebuyers to believe they would own the home after seven years of payment, when in fact, at the end of seven years they would still owe nearly the whole purchase price. Vision sells properties in extremely poor condition, which are sold "as is" to would-be homeowners, who invest thousands of dollars and countless hours of their own labor making the home habitable, only to lose all of that investment and all of the money paid under the contract in the event of a default. Unlike a homeowner with a mortgage, who is entitled to keep the benefit of their labors and financial investment in a home, Vision's purchasers do not accrue that benefit nor build any equity. And unlike a homeowner with a mortgage, who is entitled to the protections of the foreclosure process in the event of default on their loan, Vision's purchasers can be removed through summary eviction proceedings, which Vision frequently threatens in the event of late payments.

305.  Vision's business model involves targeting credit-starved Black communities for its predatory and abusive home purchase transactions because of the race of their residents. Vision's targeting of these areas has been effective precisely because these Black potential homebuyers lacked access to traditional mortgage lending, which was extremely tight over the relevant time period.

306.  By employing different, deliberate property acquisition strategies in

certain metropolitan areas, and utilizing a racially targeted marketing strategy while knowing that the homes it was selling were located overwhelmingly in Black neighborhoods within the Detroit CSA, Vision engaged in a pattern and practice of intentionally targeting Black homebuyers and residents of predominantly Black neighborhoods in the Detroit CSA for its predatory and abusive home purchase transactions because of their race.

307.   Vision's actions were intentional, wanton, malicious, and taken in reckless disregard of the civil rights of Plaintiffs Henderson, Faulks, and the members of the Subclass because of their race.

308.   Plaintiffs Henderson, Faulks, and the members of the Subclass are aggrieved persons as defined by Section 3602(i) of the FHA by virtue of having been subject to Vision's discriminatory practice. 42 U.S.C. § 3602(i).

309.   As a proximate result of Vision's discriminatory practice, Plaintiffs and the Class members have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their homes.

310.   Vision has maintained its practice continuously, and it represents a continuing violation of 42 U.S.C. §§ 3601 *et seq.*

311.   Liability under 42 U.S.C. §§ 3601 *et seq.* extends beyond entities that owned or disposed of property and may also reach those who assist in those transactions of ownership and disposition. Defendant Atalaya knew or should have

known that Vision was engaged in the violations of the FHA described in this Count and assisted, participated in, and facilitated these violations.

312.   Atalaya enabled Vision's discriminatory actions by acting as the primary funder of Vision's property acquisitions and helping design the predatory and abusive terms of its LOP contracts that Vision marketed to Black communities through targeted advertising. Atalaya knew detailed information about Vision's business model, including its discriminatory practice of acquiring properties through REO bulk sales in the Detroit CSA. On information and belief, Atalaya's review of Vision's business model included information related to Vision's marketing and advertising practices. Atalaya also participated in decisions regarding individual properties and contracts that were in default.

313.   Atalaya created Defendant ACM Vision V LLC in 2013 for the purpose of directly purchasing Vision properties in active LOP contracts. ACM Vision V is owned 98% by Atalaya's investment fund and 1% each by Alex and Antoni Szkaradek.

314.   On information and belief, ACM Vision V is managed by Atalaya and had the same knowledge of Vision's business model and practices.

315.   As with the other Affiliate Defendants, ACM Vision V held legal title to properties acquired through Vision's discriminatory bulk sales practice and acquired for Vision's predatory LOP scheme targeting Black communities.

316. ACM Vision V purchased properties with active LOP contracts from Vision, including at least 70 properties in the Detroit CSA. Many of these properties were located in majority Black Census tracts. ACM Vision V was the assignee and creditor of these transactions and became the counterparty on the LOP contracts. ACM Vision V held properties in Michigan that it had acquired from Vision up through 2020. ACM Vision V has filed at least 14 evictions against occupants of properties it acquired from Vision.

317. The Successor Defendants are liable for the violations carried about by Vision and the Affiliate Defendants, since they succeeded to all assets and liabilities except for the excluded liabilities, and these legal claims are not excluded in the purchase and sale agreement.

318. As a result of these violations of the FHA, VPM, VPM Holdings, the Affiliate Defendants, Atalaya, and the Successor Defendants are liable to Plaintiffs Henderson, Faulks, and the members of the Subclass for:

      a)     Compensatory and punitive damages in an amount to be determined at trial;

      b)     Injunctive relief;

      c)     Costs and disbursements; and

      d)     Attorneys' fees.

## COUNT TWO
**Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*.**
**Plaintiffs Henderson and Faulks Against VPM, VPM Holdings, Atalaya, the**
**Successor Defendants, and the Affiliate Defendants**

319.   Plaintiffs Henderson and Faulks, on behalf of themselves and the Subclass, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

320.   VPM and the Affiliate Defendants acted jointly. The Affiliate Defendants were created by VPM to hold legal title to the properties acquired for Vision's predatory LOP scheme. Each of the Affiliate Defendants is owned 49.5% by Alex Szkaradek, 49.5% by Antoni Szkaradek, and 1% by VPM Holdings LLC. The Affiliate Defendants are listed as the counter-party in every LOP contract, although Vision conducted all business on their behalf. For purposes of this Count, "Vision" refers collectively to VPM, VPM Holdings, and the Affiliate Defendants.

321.   Under ECOA, it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect to any aspect of a credit transaction," on the "basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1).

322.   Plaintiffs Henderson, Faulks, and the members of the Subclass are members of a protected class on the basis of race because they are Black.

323.   Based on all the facts alleged above, Vision's "LOP" program is credit as defined by ECOA, as it involved a right granted by a creditor to purchase property

90

and defer payment.

324.   Vision is a creditor as set forth in ECOA because in the ordinary course of its business Vision extended credit to Plaintiffs.

325.   Plaintiffs Henderson, Faulks, and the Subclass are applicants as defined by ECOA because they applied to a creditor directly for an extension of credit.

326.   Vision's practice disparately impacts Black borrowers with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

327.   By the actions described throughout this Complaint, Vision has engaged in, and will continue to engage in, a practice of discrimination against Black residents of Detroit due to their race, or the racial composition of their neighborhood, in violation of ECOA. Vision's actions constitute actionable discrimination on the basis of race.

328.   Vision's discriminatory practice of acquiring properties through REO bulk sales, which are disproportionately located in majority and predominantly Black neighborhoods of the Detroit CSA, has a disproportionate and unjustified impact on Black residents.

329.   This practice caused and continues to cause a predictable and actual harmful disparate impact on Black communities and Black homebuyers, including Plaintiffs Henderson, Faulks, and the members of the Subclass. Because Vision purchased properties in predominantly Black areas of the Detroit CSA through REO

bulk sales, Black homebuyers are and were disproportionately more likely to be impacted by Vision's practices, resulting in their eviction and loss of their home and other harmful effects, including the failure to build equity and the onerous terms required by Vision's contracts.

330.   The past and continuing acts and conduct of Vision have had and will continue to have a harmful disparate impact on Black residents of Detroit, in violation of the federally protected rights of Plaintiffs Henderson, Faulks, and the members of the Subclass.

331.   Vision's discriminatory practice is not justified by one or more substantial, legitimate, nondiscriminatory interests. To the extent Vision may claim that its practice is justified by a substantial, legitimate, nondiscriminatory interest, that interest may be achieved by less discriminatory means.

332.   Vision's practice is also intentionally discriminatory against Black homebuyers on the basis of race in violation of 15 U.S.C. § 1691(a)(1).

333.   Vision's contracts, as described throughout this Complaint, are unfair and predatory. As described above, Vision's contracts obscure the high interest rate and true payment period required to complete purchase of the home. Vision sells properties in extremely poor condition, which are sold "as is" to would-be homeowners, who invest thousands of dollars and countless hours of their own labor making the home habitable, only to lose all of that investment and all of the money

paid under the contract in the event of a default. Unlike a homeowner with a mortgage, who is entitled to keep the benefit of their labors and financial investment in a home, Vision's purchasers do not accrue that benefit nor build any equity. And unlike a homeowner with a mortgage, who is entitled to the protections of the foreclosure process in the event of default on their loan, Vision's purchasers can be removed through summary eviction proceedings, which Vision frequently threatens in the event of late payments.

334. Vision's business model involves targeting credit-starved Black communities for its predatory and abusive home purchase transactions because of the race of their residents. Vision's targeting of these areas has been effective precisely because these Black potential homebuyers lacked access to traditional mortgage lending, which was extremely tight over the relevant time period.

335. By employing different, deliberate property acquisition strategies in certain metropolitan areas, and utilizing a racially targeted marketing strategy while knowing that the homes it was selling were located overwhelmingly in Black neighborhoods within the Detroit CSA, Vision engaged in a pattern and practice of intentionally targeting Black homebuyers and residents of predominantly Black neighborhoods in the Detroit CSA for its predatory and abusive LOP transactions because of their race.

336. Vision's actions were intentional, wanton, malicious, and taken in

reckless disregard of the civil rights of Plaintiffs Henderson, Faulks, and the members of the Subclass because of their race.

337. Plaintiffs Henderson, Faulks, and the members of the Subclass are aggrieved persons as defined by ECOA by virtue of having been parties to Vision's predatory and abusive LOP transactions.

338. As a proximate result of Vision's discriminatory practice, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their homes.

339. Vision has maintained its practice continuously, and it represents a continuing violation of 15 U.S.C. § 1691(a)(1).

340. Atalaya knew or should have known that Vision was engaged in the violations of the ECOA described in this Count and assisted, participated in, and facilitated these violations.

341. Atalaya enabled Vision's discriminatory actions by acting as the primary funder of Vision's property acquisitions and helping design the predatory and abusive terms of its LOP contracts that Vision marketed to Black communities through targeted advertising. Atalaya knew detailed information about Vision's business model, including its discriminatory practice of acquiring properties through REO bulk sales in the Detroit CSA. On information and belief, Atalaya's review of Vision's business model included information related to Vision's marketing and

advertising practices. Atalaya also participated in decisions regarding individual properties and contracts that were in default.

342.   As described in the factual background section, Atalaya financed the acquisition of the properties by VPM which VPM then offered to consumers through seller-financing. Atalaya's loans to Vision were secured by collateral, including the properties themselves.

343.   As described above, Atalaya consulted with Vision regarding the terms of the LOP agreement Vision intended to use and knew that it was financing Vision's bulk purchase of REO properties, including from government and quasi-government agencies. Atalaya, in the ordinary course of its business, participated in the credit decisions, including setting the terms of the transactions Vision would extend to consumers.

344.   Atalaya's business involves "specialty finance." It has made over 200 specialty finance investments. In over 90% of the firm's investments, it functions as a lender. Atalaya is a creditor under ECOA, because in the ordinary course of its business, it regularly extends credit and regularly participates in credit decisions, including setting the terms of the credit.

345.   ACM Vision V was created by Atalaya in 2013 for the purpose of directly purchasing properties in active LOP agreements from Vision entities. ACM Vision V held properties in Michigan that it had acquired from Vision up through

2020.

346.   ACM Vision V is owned 98% by Atalaya's investment fund and 1% each by Alex and Antoni Szkaradek.

347.   On information and belief, ACM Vision V is managed by Atalaya and had the same knowledge of Vision's business model and practices.

348.   As with the other Affiliate Defendants, ACM Vision V held legal title to properties acquired through Vision's discriminatory bulk sales practice and acquired for Vision's predatory LOP scheme targeting Black communities.

349.   ACM Vision V purchased active LOP contracts from Vision, including at least 70 properties in the Detroit CSA. Many of these properties were located in majority Black Census tracts. ACM Vision V was the assignee and creditor of these transactions. On information and belief, as an arm of Atalaya, ACM Vision V participated in the decision to extend credit through Vision's LOP program. ACM Vision V has filed at least 14 evictions against occupants of properties it acquired from Vision.

350.   The Successor Defendants are liable for the violations carried about by Vision and the Affiliate Defendants, since they own all the equity in those entities, and succeeded to all assets and liabilities except for the excluded liabilities, and these legal claims are not excluded in the purchase and sale agreement. The Successor Defendants and Vision share common ownership, and the Successor Defendants

carry on the same business operations with the same management as Vision.

351.   As a result of these ECOA violations, VPM, VPM Holdings, the Affiliate Defendants, Atalaya, and the Successor Defendants are liable to Plaintiffs Henderson, Faulks, and the members of the Subclass for:

        a)     Compensatory and punitive damages in an amount to be determined at trial;

        b)     Injunctive relief;

        c)     Costs and disbursements; and

        d)     Attorneys' fees.

## COUNT FIVE[2]
### Violation of Truth in Lending Act
### All Plaintiffs Against VPM the Affiliate Defendants, and US Home Rentals, LLC

352.   Plaintiffs, on behalf of themselves and the Class, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

353.   At all times relevant hereto, VPM, in the ordinary course of its business, regularly extended consumer credit for which a finance charge was imposed.

354.   In the calendar years 2013, 2014, 2015, 2016, 2017, and 2018, VPM extended more than five loans each year primarily for personal, family, or household

---

[2] Counts three, four, eight, and nine were dismissed without prejudice when the Court declined to exercise supplemental jurisdiction over the state law claims.

purposes that were secured by a dwelling.

355.   The Affiliate Defendants held title to the homes and also entered into the transactions as a counter-party to the contract. VPM and the Affiliate Defendants engaged in a joint venture, in which they acted together as creditors in the transactions. For purposes of this Count, VPM and the Affiliate Defendants are jointly referred to as "Vision."

356.   Vision extended credit to each of the Plaintiffs and the Class members in a consumer credit transaction. Vision was the initial payee, the loan was payable in more than four installments, and the extended credit was subject to a finance charge. In connection with these transactions, Vision acquired a security interest in residential real property owned by the Class members and used as their principal dwellings.

357.   Vision's transactions are subject to TILA, 15 U.S.C. § 1601 *et seq.*

358.   Plaintiffs and the Class members are consumers as defined by TILA, who entered into residential mortgage loans as defined by TILA.

359.   Vision failed to make any of the disclosures required by TILA to the Plaintiffs and Class members, including the finance charge, annual percentage rate, the total number of payments required to own the home, the amount of the purchase price that would be owed at the end of the seven-year period, or the fact that a security interest in the home was taken.

360.   Vision did not conduct a reasonable, good faith evaluation of Plaintiffs and the Class members' ability to afford their obligations under the contract, including their other debts and the obligation to make all repairs necessary to bring the home into habitable condition within three months of the contract's signing. Upon information and belief, Vision did not conduct a reasonable evaluation of Plaintiffs and the Class members' expected residual income or back-end debt-to-income ratio. Upon information and belief, Vision did not verify or document the expenses that would be necessarily to fulfill the contractual obligation to bring the home into habitable condition, and did not verify or document that Plaintiffs and the Class members could afford these expenses.

361.   Vision violated TILA and its implementing regulation, 12 C.F.R. § 1026 ("Regulation Z"), by failing to verify Plaintiffs and the Class members' ability to pay through documented income and assets.

362.   On information and belief, Vision's transactions in the Detroit CSA were all "higher priced mortgage loans" as defined by TILA because the annual percentage rate exceeded the average prime offer rate by more than 1.5%. Over the time period in question, the average prime offer rate ranged from 2.8 to 4% for loans of the relevant repayment term. Vision's transactions in the Detroit CSA carried annual percentage rates of at least 8%, using Vision's calculations; and in almost all cases the annual percentage rate was in fact much higher due to a padded purchase

price (versus the discounted cash price offered by Vision) or excess escrow collection.

363.   Vision violated TILA and Regulation Z by, upon information and belief, failing to obtain a written appraisal from a licensed or certified appraiser in connection with Plaintiffs and the Class members' loans, despite the fact that all of Vision's transactions in the Detroit CSA were higher priced mortgage loans. Plaintiffs and Class members were not provided a copy or notified of any appraisal of the home.

364.   Vision violated TILA and Regulation Z by, upon information and belief, failing to maintain an escrow account for Plaintiffs and the Class members' required homeowner's insurance, despite the fact that all of Vision's transactions in the Detroit CSA were higher priced mortgage loans.

365.   On information and belief, Vision's transactions in the Detroit CSA were high-cost loans as defined by TILA, 15 U.S.C. § 1602(aa)(1)(A), because the annual percentage rate for the transactions exceeded the average prime offer rate by more than 6.5%. Over the time period in question, the average prime offer rate ranged from 2.8 to 4% for loans of the relevant repayment term. When factoring in the padded purchase price (versus the discounted cash price offered by Vision) and excess escrow collection, the annual percentage rate of Plaintiffs and the Class members' transactions exceeded the average prime offer rate by more than 6.5%.

366.   Vision violated TILA and Regulation Z by failing to furnish additional disclosures that must be provided three days in advance of the consummation of a high-cost loan transaction, 15 U.S.C. § 1639(b); failing to ensure that consumers received counseling from an independent HUD-approved housing counselor prior to consummation, 12 C.F.R. § 1026.34(a)(5); charging late fees in excess of 4% of the unpaid payment, 12 C.F.R. § 1026.34(a)(8)(i); and failing to verify Plaintiffs and the Class members' ability to pay.

367.   Vision's transactions meet the definition of a credit sale under TILA, in that the consumers agreed to pay a sum substantially equal to the value of the home, would become the owner of the property upon compliance with the agreement for no or nominal consideration, and was not terminable without penalty. Vision failed to make the required disclosures, including failing to disclose the total sale price of the transaction.

368.   On information and belief, US Home Rentals is the assignee and current creditor, having been assigned the contracts by Vision and the Affiliate Defendants.

369.   Based on the above-described violations of TILA and Regulation Z, VPM, the Affiliate Defendants, and US Home Rentals are liable to Plaintiffs and members of the Class for:

    a)    Compensatory damages in an amount to be determined at trial;

    b)    Statutory damages;

    c)     Enhanced damages;

    d)     Costs; and

    e)     Attorneys' fees.

## COUNT SIX
## Violation of Truth in Lending Act's Servicing Rules
## All Plaintiffs Against VPM

370.   Plaintiffs, on behalf of themselves and the Class, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

371.   At all times relevant hereto, VPM, in the ordinary course of its business, regularly extended consumer credit for which a finance charge was imposed.

372.   VPM is both the creditor and servicer in Plaintiffs and the Class members' consumer transactions.

373.   The transactions at issue in this litigation are federally related mortgage loans for purposes of RESPA because they were made by a creditor, as defined by TILA, which made more than $1 million per year in loan transactions secured by a dwelling.

374.   At no time has VPM ever sent periodic statements to Plaintiffs and the Class members.

375.   Plaintiffs and the Class members have been harmed by VPM's failure to send periodic statements, including by being more likely to miss a payment or pay

late, being unaware that VPM was collecting an amount for the escrow far in excess of the annual property tax bill, being unaware that VPM was at times failing to pay the property taxes in a timely way, incurring penalties and late fees, and passing those along to Plaintiffs and the Class members.

376.   Based on the above-described violations of TILA and Regulation Z, VPM is liable to Plaintiffs and members of the Class for:

      a)     Compensatory damages in an amount to be determined at trial;

      b)     Costs; and

      c)     Attorneys' fees.

**COUNT SEVEN**
**Violation of the Real Estate Settlement Procedures Act,**
**12 U.S.C. § 2601 *et seq*.**
**All Plaintiffs Against VPM**

377.   Plaintiffs, on behalf of themselves and the Class, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

378.   Plaintiffs and the Class members' transactions are federally related mortgage loans for purposes of RESPA because they were made by a creditor as defined by TILA who makes more than $1 million per year in loan transactions secured by a dwelling.

379.   Plaintiffs and the Class members are borrowers under RESPA.

380.   VPM is a servicer as defined by RESPA because it services the covered

loan transactions.

381.   VPM has mishandled the servicing of the escrow accounts of Plaintiffs and the Class members in at least the following ways: collecting funds in excess of the amount needed to pay required property taxes, failing to conduct an annual escrow analysis and calculate the proper escrow payment, failing to provide annual escrow statements to Plaintiffs and the Class members, failing to return surplus escrow funds to Plaintiffs and the Class members, and failing to make timely payments out of escrow.

382.   In failing to make timely disbursements out of the escrow account for property taxes, VPM caused penalties, fees, and interest to accrue and passed those additional penalties, fees, and interest on to Plaintiffs and the Class members.

383.   VPM has violated at least the following duties and requirements of RESPA and Regulation X, 12 C.F.R. §§ 1024.17 and 1024.34: the duty to perform escrow analysis and calculate proper escrow payments, the duty to provide annual escrow statements, the duty to timely refund escrow surpluses, and the duty to make timely payments out of escrow.

384.   Because of these violations, VPM is liable to Plaintiffs and the Class members for:

> a)   Actual damages;
>
> b)   Statutory damages;

c) Costs; and

d) Attorneys' fees.

## XVII. CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs and the Class Members respectfully pray for the Court to enter relief as follows:

(1) Certify the case as a class action on behalf of the Class and Subclass;

(2) Designate all Plaintiffs as representatives of the Class;

(3) Designate Plaintiffs Henderson and Faulks as representatives of the Subclass;

(4) Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*;

(5) Enter a permanent injunction enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to reforming the

transactions to remedy their unfair and deceptive structure, requiring Vision to transfer title to the Class members, requiring Vision to pay the property taxes for so long as Vision has collected for an escrow, and to refund any surplus escrow funds to the Class members, and requiring VPM to pay off the balance of the loans now owned to Vision's assignees;

(6) Award compensatory damages to Plaintiffs in an amount to be determined by a jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants, including but not limited to compensation for the funds Plaintiffs have paid out of pocket and time spent on repair of their homes;

(7) Award punitive damages to Plaintiffs for their claims under the Fair Housing Act and Equal Credit Opportunity Act in an amount to be determined by a jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter such conduct in the future;

(8) Award any statutory or enhanced damages authorized by law, including under the Truth in Lending Act and the Real Estate Settlement Procedures Act;

(9) Award Plaintiffs reasonable attorneys' fees and costs;

(10) Award such other and further relief as the Court deems just and proper.

TRIAL BY JURY DEMANDED.

This 29th day of January, 2021,

By: /s/ Sarah B. Mancini
**NATIONAL CONSUMER LAW CENTER**
Sarah B. Mancini (G.B. # 319930)
Stuart T. Rossman (B.B.O. #430640)
7 Winthrop Square
Boston, MA 02110
Tel: (617) 542-8010
smancini@nclc.org
srossman@nclc.org

**AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN**
Bonsitu Kitaba-Gaviglio (P78822)
Daniel S. Korobkin (P72842)
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6800
bkitaba@aclumich.org
dkorobkin@aclumich.org

**MICHIGAN POVERTY LAW PROGRAM**
Lorray S. C. Brown (P60753)
15 South Washington Street, Suite 202
Ypsilanti, Michigan 48197
Tel.: (734) 998-6100 ext. 613
Fax.: (734) 998-9125
lorrayb@mplp.org

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**
Jennifer A. Holmes (D.C. Bar ID 1018798)
Coty Montag (D.C. Bar ID 498357)
700 14th Street NW, Suite 600
Washington, DC 20005

Tel.: (202) 682-1300
jholmes@naacpldf.org
cmontag@naacpldf.org


*Attorneys for Plaintiffs and the*
*Putative Classes*

<u>CERTIFICATE OF SERVICE</u>

I certify that on January 29, 2021 I electronically filed the foregoing First

Amended Complaint with the Clerk of the Court using the ECF system which will

send notification to the attorneys of record.


Respectfully submitted,

BY:   <u>s/ Sarah B. Mancini</u>
  Sarah B. Mancini (G.B. # 319930)
  **NATIONAL CONSUMER LAW
  CENTER**
  7 Winthrop Square
  Boston, MA 02110
  Tel: (617) 542-8010
  smancini@nclc.org


Dated:   January 29, 2021