UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Rhonda Henderson, *et al.*,

    Plaintiffs,

v.

Vision Property Management, LLP, *et al.*,

    Defendants.
_____/

Case No. 20-12649

Sean F. Cox
United States District Court Judge

**OPINION AND ORDER DENYING
DEFENDANTS' MOTION TO DISMISS**

    This is a civil rights class action. Plaintiffs allege Defendants violated the Fair Housing Act, the Equal Credit Opportunity Act, the Truth in Lending Act, and the Real Estate Settlement Procedures Act through "a deceptive home purchase program that discriminated against Black communities in Southeast Michigan." (Pl's Br., ECF No. 81, at PageID 484).

    The matter currently before the Court is Defendants Atalaya Capital Management LP ("Atalaya") and ACM Vision V LLC ("ACM")'s motion to dismiss, brought pursuant to FED. R. CIV. P. 12(b)(6). (ECF No. 81). For the reasons set forth below, the Court DENIES Atalaya and ACM's motion.

## BACKGROUND

    On September 29, 2020, Plaintiffs Rhonda Henderson ("Henderson"), Roberta Faulks ("Faulks"), and Rachel Church ("Church"), on behalf of themselves and all other similarly situated (collectively, "Plaintiffs") initiated this action. (ECF No. 1).

1

On January 6, 2021, Atalaya and ACM moved to dismiss pursuant to Rule 12(b)(6). (ECF No. 71). In an order regarding that motion, this Court granted Plaintiff the opportunity to file an amended complaint. (ECF No. 72).

On January 29, 2021, Plaintiffs filed an Amended Complaint. (ECF No. 77). As such, that pleading superseded and replaced the original complaint. The filing of this new pleading also rendered moot the motion to dismiss pursuant to Rule 12(b)(6) (ECF No. 71) that challenged the original complaint.

Because this matter comes before the Court on a motion to dismiss the Amended Complaint, the following allegations in Plaintiffs' Amended Complaint are taken as true. (ECF No. 77); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

There are twenty-four Defendants in this case that Plaintiffs allege were involved in "discriminatory targeting of Black homebuyers for abusive credit terms in home purchase transactions." (ECF No. 77 at PageID 308). The first named Defendant is Vision Property Management, LLP ("VPM"), which "regularly engages in the business of home purchase lending and home purchase transactions" (ECF No. 77, at PageID 312). "VPM decided which properties to acquire for its predatory lease with option to purchase scheme (which it called, in shorthand, its "LOP" program.)" (ECF No. 77, at PageID 312). "VPM was the entity that interfaced with all members of the Class, established the terms of the transactions, loaned the money, and serviced the loans and escrows." (ECF No. 77, at PageID 312).

Defendants involved in this motion to dismiss are Atalaya and ACM. Atalaya is a privately held, SEC-registered alternative investment advisory firm. (ECF No. 77 at PageID 351). Atalaya "funded and substantially participated in the design of the home purchase lending business of VPM." (ECF No. 77 at PageID 317). ACM is a real estate investment trust, which was created by

Atalaya to hold title to numerous inhabited homes and become a counterparty on the associated LOP contracts. (ECF No. 77, at PageID 355).

In their Amended Complaint, Plaintiffs allege one claim of "violation of the Fair Housing Act, 42 U.S.C. §§3604, 3605 Plaintiffs Henderson and Faulks Against VPM, VPM Holdings, Atalaya, the Successor Defendants, and the Affiliate Defendants" (Count One). (ECF No. 77, at PageID 388); one claim of "violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. Plaintiffs Henderson and Faulks Against VPM, VPM Holdings, Atalaya, the Successor Defendants, and the Affiliate Defendants" (Count Two) (ECF No. 77, at PageID 396); one claim of "Violation of Truth in Lending Act All Plaintiffs Against VPM the Affiliate Defendants, and US Home Rentals, LLC" (Count Five[1]) (ECF No. 77, at PageID 403); one claim of "Violation of Truth in Lending Act's Servicing Rules All Plaintiffs Against VPM" (Count Six) (ECF No. 77, at PageId 408); and one claim of "Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*. All Plaintiffs Against VPM" (Count Seven) (ECF No. 77, at PageID 409). The relevant claims to this motion against Atalaya and ACM are Counts One, Two, and Five.

The Amended Complaint is a lengthy 109 pages. (ECF No. 77). For the purposes of this motion to dismiss on behalf of two of the twenty-four Defendants, the Court will briefly summarize Plaintiff's main allegations and only describe in detail the pleadings relevant to the two Defendants at issue: Atalaya and ACM.

Plaintiffs allege that following the foreclosure crisis in 2008, Vision "developed a business model to exploit inequalities in the housing market for significant financial gain." (ECF No. 77, at PageID 324). Vision bought dilapidated homes cheaply then sold them with a significant markup

---

[1] Counts three, four, eight, and nine were dismissed without prejudice when the Court declined to exercise supplemental jurisdiction over the state law claims.

through a lease with option to purchase ("LOP") to homebuyers who lacked other options for homeownership due to limited income and credit. (ECF No. 77, at PageID 324-326). Despite marketing its LOP program as a way to help people become homeowners, "almost no one entering into its contracts [] succeeded in becoming a homeowner." (ECF No. 77, at PageID 331). "In sum, Vision's program was designed to induce low-income homebuyers with few other options to invest significant money and make significant improvements to a home that, in all likelihood, they would never own." (ECF No. 77, at PageID 336). Plaintiffs also allege "Vision's practices both intentionally targeted Black prospective homebuyers because of their race and had a disparate impact on Black homebuyers and on the residents of predominantly Black neighborhoods in the greater Detroit area." (ECF No. 77, at PageID 336).

Regarding the involvement of Atalaya and ACM, Plaintiffs allege Vision's actions "were possible only because of the funding it received from Atalaya." (ECF No. 77, at PageID 350). VPM approached Atalaya in 2012 to be a potential lender to fund acquisition of properties through bulk transactions for its LOP program, including properties in Michigan. (ECF No. 77, at PageID 351). In the email soliciting Atalaya to be an investor, VPM emphasized that the LOP program was only way to profit from severely distressed foreclosed homes. (ECF No. 77, at PageID 351-352). Atalaya began funding VPM's property acquisitions in 2013. (ECF No. 77, at PageID 352).

Based on information uncovered by regulators in New York, Wisconsin, and Pennsylvania, as well as Plaintiffs' investigation in this case, VPM operated similarly in all states where it acquired properties. (ECF No. 77, at PageID 355). In the Amended Complaint, Plaintiffs cite to findings made in the public record by the New York Attorney General and Department of Financial Services after an investigation (the "New York findings"). The following allegations stem from information gained from the New York findings.

4

> Atalaya consulted with VPM regarding the terms and structure of its LOP form agreement, obtained tax opinions that shaped how Vision structured the LOP agreement, and received financial records that showed how VPM internally tracked its contracts in a manner similar to a land contract, internally recording the interest rate and true duration of the loan, information not disclosed to homebuyers in the LOP contract.

(ECF No. 77, at PageID 352). Atalaya received regular reporting regarding Vision's business from Vision's owners and senior management, reviewed the performance of the properties sold by Vision, and conducted due diligence on Vision's operations. (ECF No. 77, at PageID 352). Atalaya either was aware, or should have been aware, that VPM was engaged in an illegal, predatory mortgage lending business, but nonetheless agreed to fund property acquisitions by Vision, and thereby help Vision expand its operations. (ECF No. 77, at PageID 353). Atalaya knew or should have known that Vision entered into transactions with consumers who were unlikely to be able to afford the ongoing monthly payments along with the costs of repairing properties, and without assessing consumers' ability to repay the loans while making the required repairs. (ECF No. 77, at PageID 354). Atalaya knew that VPM's LOP agreement was structured to require consumers to give up any equity they had built up in the property upon default. (ECF No. 77, at PageID 354). Atalaya knew that Vision did not report payments consumers made under the LOP agreements to credit reporting agencies because VPM was trying to evade regulators. (ECF No. 77, at PageID 354). Vision wrote in a June 2012 email that its practice of not reporting to credit agencies kept it "below the radar of being a 'regulated lender', which is important to the business model." (ECF No. 77, at PageID 354).

Atalaya was VPM's most significant funder during the period of time when it was acquiring the vast majority of the inventory for its LOP business. (ECF No. 77, at PageID 354). VPM's business model involved seller financing. (ECF No. 77, at PageID 355). Because Atalaya

funded VPM's acquisition of the homes, Atalaya also acted as a lender by providing the source of capital and benefiting from the stream of payments over time. (ECF No. 77, at PageID 355).

Atalaya created ACM, a real estate investment trust, to hold title to numerous inhabited homes and become a counterparty on the associated LOP contracts. (ECF No. 77, at PageID 355). ACM purchased LOP contracts that had been originated by Vision entities in various states. (ECF No. 77, at PageID 355). As such, it was the assignee of these LOP contracts and became the record owner of the real estate, subject to the purchaser's contract to buy. (ECF No. 77, at PageID 355).

ACM purchased properties from VPM affiliates, including at least 70 properties form VPM affiliates in the Detroit CSA. (ECF No. 77, at PageID 356). ACM held properties it had acquired from Vision until at least 2020. (ECF No. 77, at PageID 356). Some of the properties ACM Vision sold were occupied by consumers in active LOP contracts. (ECF No. 77, at PageID 356). Others were sold as unoccupied REO property after a consumer unsuccessfully attempting to purchase the home through a LOP contract had been dispossessed. (ECF No. 77, at PageID 356). Court records reflect at least six evictions filed by ACM in Wayne County and at least eight in Genesee County. (ECF No. 77, at PageID 356). Many of the properties owned by ACM were located in majority Black communities. (ECF No. 77, at PageID 356).

The three named Plaintiffs in this class action entered into LOP contracts in Southeastern Michigan. (ECF No. 77, at PageID 311).

## STANDARD OF REVIEW

A motion to dismiss tests the legal sufficiency of the plaintiff's complaint. To survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

6

do." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

Although the Court must accept all well-pleaded factual allegations as true for purposes of a motion to dismiss, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Thus, to avoid dismissal, "a complaint must contain sufficient factual matter," accepted as true, to state a claim for relief that is plausible on its face. *Id.* at 678. In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts." *Id*.

"When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

**ANALYSIS**

7

As an initial matter, Atalaya and ACM argue that Plaintiffs' allegations and references to the New York findings should be disregarded. (Def's Br. at PageID 461-463). After the investigation, Atalaya and ACM entered into a consent Assurance of Discontinuation, which states that it "is not intended for use by any third party in any other proceeding." (Def's Br. at PageID 461). However, Atalaya and ACM do not cite any authority to support this assertion. (Def's Br. at PageID 461-463). Therefore, the Court denies Atalaya's request to disregard the Plaintiffs' references to the New York findings.

To support their motion to dismiss, Atalaya and ACM argue that Plaintiffs state no plausible claim against them for violation of (1) the Fair Housing Act; (2) the Equal Opportunity Act. ACM further argues that Plaintiffs have failed to state a claim against them for violation of (3) the Truth in Lending Act.[2] The Court will address each claim in turn.

**I. Fair Housing Act (Count I)**

Count One of the Amended Complaint alleges a violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605. The FHA prohibits practices that "otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The FHA also prohibits discrimination in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of membership in a protected class. 42 U.S.C. § 3604(b).

As Plaintiffs note, the Supreme Court and Sixth Circuit have repeatedly found that the language of the FHA is "broad and inclusive." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). "Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class." *Michigan Protection and*

---

[2] Defendants address this argument in their supplemental motion. (ECF No. 82).

8

*Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994). Section 3064 applies "not only to actors who were directly involved in the real estate business, but also actors who directly affect the availability of housing, such as state or local governments." *Babin*, 18 F.3d at 344. The language of the act "was designed to target those who owned or disposed of property, and those who, in practical effect, assisted in those transactions of ownership and disposition." *Babin*, 18 F.3d at 345.

Given the Sixth Circuit's broad interpretation, the Court finds Atalaya and ACM's alleged conduct falls within § 3604(a). Specific to Atalaya, Plaintiffs allege

> Atalaya enabled Vision's discriminatory actions by acting as the primary funder of Vision's property acquisitions and helping design the predatory and abusive terms of its LOP contract and Vision marketed to Black communities through targeted advertising. Atalaya knew detailed information about Vision's business model, including its discriminatory practice of acquiring properties through REO bulk sales in the Detroit CSA. On information and belief, Atalaya's review of Vision's business model included information related to Vision's marketing and advertising practices. Atalaya also participated in decisions regarding individual properties and contracts that were in default.

(ECF No. 77, at PageID 394). This is sufficient to allege that Atalaya was "an actor who directly affect[ed] the availability of housing." *Babin*, 18 F.3d at 344. Specific to ACM, Plaintiffs allege that ACM "held legal title to properties acquired through Vision's discriminatory bulk sales practice and acquired for Vision's predatory LOP scheme targeting Black communities." (ECF No. 77, at PageID 394). This is also sufficient to allege that ACM "owned or disposed of property" under § 3604.

The FHA also makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction" because of membership in a protected class. 42 U.S.C. § 3605 (a). Residential real estate-related transactions

9

are defined by the FHA as "the making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or secured by residential real estate." 42 U.S.C. § 3605(b).

Atalaya falls under this definition under Plaintiffs allegation. VPM's business model included seller financing, and "Atalaya funded VPM's acquisition of the homes, [therefore] Atalaya also acted as a lender by providing the source of capital and benefiting from the stream of payments over time." (ECF No. 77, at PageID 355).

Therefore, the Court finds that Plaintiffs have adequately alleged a claim against Atalaya and ACM under the Fair Housing Act.

## II. Equal Credit Opportunity Act (Count II)

Count Two of the Amended Complaint alleges a violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691. Under the ECOA, it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect to of a credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). Under the ECOA, "credit" means "the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R § 1002.2(j). A "creditor," under the ECOA, means "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates" 12 C.F.R. § 1002.2(l).

Plaintiffs correctly argue that the LOP contracts constitute "credit" under the ECOA because they provide for the consumer's right to purchase the home and defer payment of the purchase price. 12 C.F.R § 1002.2(j). Plaintiffs are also correct that Atalaya and ACM are

"creditors" under the ECOA because they "participate[d] in a credit decision." 12 C.F.R. § 1002.2(l). As established above, Plaintiffs pled that Atalaya funded the purchase of properties that were then sold to homebuyers through Vision's seller-financed loans. (ECF No. 77, at PageID 355). Then Atalaya received a stream of payments as homebuyers sent their payments to Vision. (ECF No. 77, at PageID 355). Plaintiffs also alleged:

> Atalaya consulted with Vision regarding the terms of the LOP agreement Vision intended to use and knew that it was financing Vision's bulk purchase of REO properties, including from government and quasi-government agencies. Atalaya, in the ordinary course of business, participated in the credit decisions, including setting the terms of the transactions Vision would extend to consumers.

(ECF No. 77, at PageID 401). Regarding ACM, Plaintiffs alleged,

> ACM Vision V purchased active LOP contracts from Vision, including at least 70 properties in the Detroit CSA. Many of these properties were located in majority Black Census tracks. ACM Vision V was the assignee and creditor of these transactions. On information and belief, as an arm of Atalaya, ACM Vision V participated in the decision to extend credit through Vision's LOP program.

(ECF No. 77, at PageID 402). This is sufficient to establish a plausible ECOA claim. Atalaya is a creditor because of its direct participation in the extension of credit and ACM is an assignee.

The Court finds that Plaintiffs have adequately alleged an ECOA claim against Atalaya and ACM.

### III. Truth in Lending Act (Count V)

In Count Five, Plaintiffs allege a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*. against ACM.

Defendants did not address Count Five in their Second Motion to Dismiss (ECF No. 80). Instead, after Plaintiffs noted this omission in their response brief, Defendants emailed Plaintiffs asking them to dismiss the TILA claim. (Pl's Br. at PageID 537). Then less than an hour later, ACM filed another motion seeking to dismiss Plaintiffs' TILA claim. (ECF No. 82). Plaintiffs note

11

that this violates FED. R. CIV. P. 12(g) and Local Rule 7(a) and request that the Court deny this motion as procedurally improper.

Regardless of the procedural issues, ACM's motion is insufficient. ACM merely states, "Count V of the FAC contains no specific allegations regarding disclosures made or not made by ACMV." (ECF No. 82). Similarly, at oral argument, ACM's counsel took the position that Count V should be dismissed against ACM because none of the named plaintiffs could identify ACM specifically as the party that held title to their homes.

However, in the Amended Complaint, Plaintiffs list ACM as an Affiliate Defendant. They further allege: "[t[he Affiliate Defendants held title to the homes and also entered into transactions as a counter-party to the contract. VPM and the Affiliate Defendants engaged in a joint venture, in which they acted together as creditors in the transactions. For purposes of this Count, VPM and the Affiliate Defendants are jointly referred to as "Vision." (ECF No. 77, at PageID 404). The Amended Complaint states that Vision's transactions are subject to the TILA and goes on to list the many ways Plaintiffs allege Vision's transactions violated the TILA, including not making the proper disclosures to Plaintiffs, failing to verify Plaintiffs' ability to pay through documented income and assets; failing to obtain a written appraisal from a licensed or certified appraiser; and failing to maintain an escrow account. (ECF No. 77 PageID 404 -407).

At this stage of the litigation, the parties have not yet had the benefit of discovery. For the purposes of a motion to dismiss, the Court must accept Plaintiffs factual allegations in the Amended Complaint as true. *Twombly*, 550 U.S. at 555. During discovery, ACM may learn the specific entity that held title to the named Plaintiff's homes. At that time, ACM may bring its argument during a motion for summary judgment.

But at this stage of the litigation, the Court finds that Plaintiffs have adequately alleged a plausible TILA claim against ACM.

## CONCLUSION

For the reasons explained above, the Court DENIES Atalaya and ACM's motion to dismiss.

IT IS SO ORDERED.

Dated: August 23, 2021

s/Sean F. Cox
Sean F. Cox
U. S. District Judge