UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RHONDA HENDERSON, et al.,<br>Plaintiffs,<br><br>v.<br><br>VISION PROPERTY MANAGEMENT, LLC et al.,<br>Defendants. | Case No. 20-12649<br>Honorable Shalina D. Kumar<br>Magistrate Judge David R. Grand |

**OPINION AND ORDER GRANTING ATALAYA CAPITAL MANAGEMENT, LP'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 185)**

## I.   Introduction

Plaintiffs sue Vision Property Management, LLC (VPM) and its affiliated entities[1] (collectively Vision); FTE Networks, Inc. and US Home Rentals, LLC, as successor organizations to Vision (collectively USHR); Atalaya Capital Management LP (ACM), ACM Vision V, LLC; Inmost Partners, LLC, DS Agent, LLC, Statebridge Company, LLC (collectively Noteholder Agent); Kookmin Bank and Samsung Securities Co., Ltd.

---

[1] The affiliated entities are Kaja Holdings, LLC, Kaja Holdings 2, LLC, MI Seven, LLC, IN Seven, LLC, RV4M 4, LLC, DSV SPV1, LLC, DSV SPV2, LLC, DSV SPV3, LLC, Boom SC, Alan Investments III, LLC, Arnosa Group LLC, Mom Haven 13, LP, and HOMI Holdings, LLC. ECF No. 205.

(collectively Issuer Noteholder)[2] for violations of the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.* (FHA), the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (ECOA), the Truth in Lending Act, 15 U.S.C. § 1601 (TILA), and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 (RESPA). ECF No. 205. Plaintiffs assert that Vision discriminated against Black homebuyers by targeting them for predatory home loan products containing abusive credit terms. *Id*. They claim that ACM funded and substantially participated in the design of Vision's predatory lending practices. *Id*.

ACM moves for summary judgment of plaintiffs' claims against it.[3] ECF No. 185. The motion is fully briefed, including supplemental briefing ordered by the Court after it heard argument from the parties on May 10, 2023. ECF Nos. 185, 189, 192, 193, 221, 222, 223, 224, 225. For the reasons set forth below, the Court **GRANTS** ACM's motion and dismisses plaintiffs' FHA and ECOA claims against all defendants.

---

[2] The Issuer Noteholder defendants do not appear to have been served.

[3] The Vision, USHR, and Noteholder Agent defendants all concur in ACM's motion for summary judgment on plaintiffs' FHA and ECOA claims and argue that they are entitled to summary judgment against plaintiffs based on the disparate impact argument advanced by ACM. ECF Nos. 189, 223, 224, 225.

## II. BACKGROUND

Plaintiffs allege that defendants engaged in "reverse redlining," a practice in which lenders offer abusive credit terms to residents to whom credit was traditionally unavailable. ECF No. 205. According to plaintiffs, Vision bought dilapidated homes in bulk real estate owned (REO)[4] sales and resold them for a significant markup to homebuyers who would not qualify for a traditional mortgage. *Id*. at PageID.5559, ¶ 63. Vision identified and acquired residential properties in bulk for cash resale or a variety of financed homebuying programs, including the lease with option to purchase program (LOP). *Id*.; ECF No. 185.

Plaintiffs entered LOP contracts with Vision for homes they purchased in southeastern Michigan. Vision's LOP contracts did not carry the same statutory protections for homebuyers as mortgages or land contracts and, according to plaintiffs, concealed imbedded finance charges and borrowing costs, which would have been disclosed clearly and conspicuously in overt loan transactions, including land contracts. ECF No. 205. Plaintiffs allege that the LOP contracts carried other onerous terms, which often triggered homebuyer default. *Id*. For example, some LOP

---

[4] Real estate owned, or REO, is a term used to describe a class of property owned by a lender—typically a bank, government agency, or government loan insurer—after a foreclosure auction.

contracts required the purchaser/lessee to bring uninhabitable property into habitable condition within three months to avoid default. *Id*. Payments under these contracts became due before the buyers could inhabit the acquired home and while they were funding the necessary and often extensive repairs. *Id*.

Plaintiffs assert that Vision's practice of acquiring distressed residential properties and marketing low-income homeownership through LOP contracts in predominantly Black, metropolitan Detroit neighborhoods had a disparate impact on Black homebuyers, thus violating both the FHA and the ECOA. Plaintiffs claim that Vision and ACM, an SEC-registered investment advisor that loaned funds to Vision for buying bulk REO properties, jointly conducted property acquisitions and established terms of the LOP transactions. *Id*. at PageID.5586-96. Plaintiffs assert that ACM's collaboration with Vision in its acquisition and disposition of residential property created a sufficient nexus for ACM to be liable with Vision for discrimination under both FHA and ECOA. *Id.* at PageID.5656-68.

ACM argues in its motion for summary judgment that Vision's acquisition and disposition transactions did not have a disparate impact on Black homebuyers because disparate impact must be measured by the impact of Vision's residential transaction program as a whole, not as

applied to some artificially defined and narrow subset of affected homebuyers. ACM argues that only a small portion of the roughly 4,000 homes Vision purchased with its borrowed funds were in Michigan. ACM notes there is no dispute that Vision offered LOP contracts to white residents on the same terms as those offered to Black residents. On this basis, ACM asserts that plaintiffs cannot show that Vision's residential property transactions nationwide have had a disparate impact on Black residents and thus their claims fail.

ACM alternatively argues that it did not violate the FHA because it did not control or approve of the transactions alleged to have resulted in the racial discrimination. It maintains that the mere facilitation of a loan that allegedly allowed discrimination by another is not enough to constitute discrimination under the FHA. Likewise, it argues that it was not involved in any credit transaction with any plaintiff and thus is entitled to summary judgment on plaintiffs' ECOA claim.

### III. ANALYSIS

#### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it

is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012). The burden may be satisfied by presenting affirmative evidence that negates an element of the nonmovant's claim or by demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the nonmovant must respond with affidavits or other evidentiary materials designating "specific facts showing that there is a genuine issue for trial." *Id*. at 324. To avoid summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). Summary judgment is

appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### B. Disparate Impact

To state a prima facie case of disparate-impact discrimination under the FHA and the ECOA,[5] a plaintiff must (1) identify and challenge a specific housing practice and then (2) show that the practice had an adverse effect on members of a protected class by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question. *Graoch Associates # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Rel. Comm'n,* 508 F.3d 366, 377 (6th Cir. 2007). To assess whether an impact is, in fact, disparate, "the correct inquiry is whether the [program] in question had a disproportionate impact on the minorities in the total group *to which the policy was applied*." *Id*. at 378 (internal quotation marks omitted) (emphasis in original); *see also Waldon v. Cincinnati Pub. Schs.*, 89 F. Supp. 3d 944, 948-49 (S.D. Ohio 2015).

---

[5] Courts recognize disparate impact claims under the ECOA and apply the same standards and analysis to those claims as they do disparate impact claims under the FHA. *See Golden v. City of Columbus*, 404 F.3d 950, 963-65 (6th Cir. 2005); *see also Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 926-27 (N.D. Cal. 2008) (collecting cases).

ACM argues that it is entitled to summary judgment on plaintiffs' disparate impact claim because plaintiffs have not established that Vision's business practice had a disproportionate impact on the minorities in the total group to which it applied. ACM argues that the relevant yardstick here is Vision's nationwide homebuyers because Vision bought and sold residential property in 47 states. Plaintiffs counter that Vision's Michigan homebuyers are the appropriate group by which to measure disparate impact because Vision did not acquire and dispose of residential property in a nationally uniform manner.

If local policies function differently from system-wide policies, the narrower group is the proper touchstone for disparate impact. *See Regner v. City of Chicago*, 789 F.2d 534 (7th Cir. 1986) (holding when promotion policy operated differently at main library than it did in the branches, the main library, not the entire library system, was the operative measuring group); *see also Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987-88 (4th Cir. 1984) (holding when landlord banned children in only one of the many buildings within an apartment complex, disparate racial impact was measured against residents of that building, not the entire complex). Conversely, courts condemn the use of a contrived subset of an affected group as a benchmark because that "sort of analytical cherry picking

pushes the disparate impact doctrine toward a level of granularity at which it loses its meaning." *Boykin v. Gray*, 986 F. Supp. 2d 14, 20 (D.D.C. 2013) (citing *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1087 (D.C. Cir. 2011)).

Both *Boykin* and *Greater New Orleans* are particularly instructive here. *Boykin*, 986 F. Supp. 2d at 20; *Greater New Orleans*, 639 F.3d at 1086-87. In *Boykin*, a group of homeless men sued the District of Columbia after it closed the homeless shelter where they frequently stayed. 986 F. Supp. 2d at 16. The men argued that the closure of the shelter caused a disparate impact on minorities in violation of the FHA. *Id*. The court noted "the distinction between discrete acts that affect individuals or small groups, and policies that are generally applicable," and that the latter is "the more appropriate object of disparate impact analysis." *Id*. at 20. The *Boykin* court determined that, without evidence that the closure of the 90-bed homeless shelter was representative of a broader adverse impact suffered by the homeless population of Washington, D.C., the closing of the shelter itself did "not constitute evidence that a protected class of persons ha[d] been disproportionately affected in a manner cognizable under the FHA." *Id*. at 23.

The plaintiffs in *Greater New Orleans* challenged a Louisiana program that provided grants to help homeowners rebuild after hurricanes Katrina and Rita, arguing that the grant formula employed within that program violated the FHA because it had a disparate impact on Black homeowners in New Orleans. *Id*. at 1079, 1081. The determinative question before that court: whether the formula had a disparate impact on Black grant applicants in Louisiana as a whole rather than just in New Orleans. The court reasoned that attention to the formula's effects as a whole precluded it from considering the effects of the formula only in Orleans Parish. *Id*. at 1086.

> If the economic profiles of racial groups differ from parish to parish in the parts of Louisiana affected by hurricanes Katrina and Rita, then a grant formula that has non-disparate racial effects for Louisiana as a whole can easily have a disparate impact on African–American residents in at least some individual parishes (not to mention smaller geographic units). To allow plaintiffs to pick a special subset of the affected localities to test for disparate impact would . . . expose almost any grant formula to litigation. Although plaintiffs focus much of their case on Orleans Parish, we must consider the impact on Louisiana as a whole.

*Id*.

This Court faces a similar inquiry here: did Vision's program of acquiring and reselling distressed residential properties have a disparate impact on Black homebuyers. ACM argues that Vision bought and sold

residential property in 47 states and thus the Court must look at Vision's homebuyers nationwide to assess whether its practices disproportionately impacted minorities. Plaintiffs counter that Vision's Michigan homebuyers are the appropriate group by which to measure for disparate impact because Vision did not operate under a nationally uniform business model.

Plaintiffs argue that, although Vision purchased and resold properties nationwide, it implemented different acquisition and disposition strategies in different states or regions. ECF No. 192-2, PageID.3842; ECF No.192-4, PageID.3976, 3992, 3995. To support their argument, plaintiffs cite to Vision and ACM email correspondence discussing the deliberate concentration of Vision purchases in different markets based on different strategies for disposition. *See, e.g.*, ECF No. 192-4, PageID.3976, 3987, 3990, 3992, 3995. According to these emails and the testimony of key Vision and ACM personnel, properties purchased in Florida and the Southwest were mostly intended for cash sale disposition; properties in the Midwest, particularly those in urban areas (Chicago, Detroit, Cleveland), which were known to be in a greater state of disrepair, were acquired largely for disposition via LOP. ECF No. 192-2, PageID.3842-43, 3847, ECF No. 192-4, PageID.3987, 3876, 3990, 3992, 3995; ECF No. 192-13, PageID.4630-31; ECF No. 192-20, PageID.4725. These emails identified

Illinois, Indiana, Ohio, along with Michigan as "hot beds" for Vision's LOP resales and thus target areas for acquisitions. ECF No. 192-4, PageID.3976.

The Court agrees that the evidence supplied by plaintiffs demonstrates that Vision's home purchase and resale practices were not nationally uniform. *See, e.g.*, ECF No. 192-2, PageID.3842-43, 3847; ECF No.192-4, PageID.3976, 3987, 3990, 3992, 3995; ECF No. 192-13, PageID.4630-31; ECF No. 192-20, PageID.4725. But to survive the motion for summary judgment, plaintiffs must do more than merely negate ACM's claim that it applied its home buying and resale practices uniformly nationwide. Plaintiffs must define the total group subject to Vision's business model because whether Vision's acquisition and disposition program had a disproportionate impact on the minorities in the total group to which it applied is an element essential to plaintiffs' case and one on which they bear the burden of proof at trial.

To this end, plaintiffs argue that Vision's practices in Michigan were unique to Michigan, thereby making Michigan homebuyers the appropriate group from which to assess the existence of disparate impact. But the evidence to which plaintiffs point to support their claim that Vision implemented different acquisition and disposition strategies in different

areas of the country does not establish that Vision's acquisition and disposition practice was unique to Michigan and thus does not support plaintiffs' argument that Vision homebuyers in Michigan would define the total group for purposes of measuring disparate impact.

Indeed, the evidence on which plaintiffs rely most heavily demonstrates that Vision implemented distinct regional acquisition strategies for the Midwest, but not exclusively Michigan. As noted above, Vision targeted residential property acquisitions in Illinois, Indiana, Ohio, and Michigan because these areas were fertile ground for its LOP program. ECF No. 192-4, PageID.3976. Plaintiffs also cite evidence that Vision targeted acquisition of poor-condition assets in Midwestern inner cities, like Chicago, Detroit, and Cleveland. ECF No. 192-20, PageID.4725. Vision's founder and CEO acknowledged in his testimony that Vision's LOP business was concentrated in the Midwest, as compared to other regions, like the Southwest. ECF No. 192-2, PageID.3842-43.

Plaintiffs point to Vision's acquisition of properties from taxing authorities and/or land banks[6]—a practice it exercised only in Michigan—to support their position that Michigan Vision homebuyers are the applicable

---

[6] Plaintiffs do not provide evidence that Vision purchased properties in Michigan through a land bank. *See e.g.*, ECF Nos. 192-11, PageID.4426-30, 192-24, PageID.4920.

touchstone from which to assess disparate impact. *See, e.g.*, ECF Nos. 192-2, PageID.3838-39, 192-11, PageID.4426-30. Vision acquired approximately 126 properties from a 2013 bulk foreclosure sale by the Wayne County Tax Assessor. ECF No. 192-29, PageID.5177. Such an acquisition of properties from a tax sale seemingly occurred only in Michigan. ECF Nos. 192-2, PageID.3838, 192-12, PageID.4558.

However, plaintiffs offer no explanation of how or if that singular event meaningfully altered Vision's acquisition and disposition practice used throughout the Midwest. Plaintiffs' expert notes that the Wayne County auction sale was "functionally similar to bulk sales," the method Vision typically used for its acquisitions. *Id*. The portion of the record plaintiffs cites within their tax sale argument references Freddie Mac and Fannie Mae pools, discusses "markets where have (sic) achieved historical success or where CFD product economics work," and does not mention tax sales or Michigan. ECF No. 192-4, PageID.3990; ECF No. 221, PageID.5840. Nothing in plaintiffs' argument or in the evidence they offer illuminates how or if the properties acquired by way of the tax foreclosure auction in Michigan differed from the properties acquired by way of bulk REO sales in and out of Michigan. The Court finds that, without more, Vision's acquisition of a single tranche of houses from tax foreclosure sale, and not its typical

bulk REO, is a distinction without a difference and does not create a genuine issue of fact as to whether Vision's operations in Michigan were unique.

Plaintiffs further attempt to establish that Vision's operations were somehow distinct in Michigan by pointing to their expert's finding that Michigan properties represented 15% of Vision's nationwide portfolio. *See* ECF No. 221, PageID.5840-41 & n.1. ACM disputes that calculation, but even if this statistic were accurate, it does not support plaintiffs' argument. That statistic shows no Michigan-specific emphasis within Vision's portfolio without comparing it with Vision's holdings in other states, particularly those in the Midwest. Because plaintiffs do not analyze Vision's Michigan holdings relative to geographic concentration elsewhere in Vision's portfolio, plaintiffs' statistic does not reveal a focus and targeting of property specifically in Michigan.

Plaintiffs also argue that Vision's LOP contract functions differently in Michigan due to peculiarities in Michigan law. According to plaintiffs, Michigan's landlord-tenant laws make Vision's LOP especially harmful to consumers. But, as *Greater New Orleans* teaches, the focus must be on the practice or policy's effects within the entire area it is employed; the effects of the practice or policy in only a single subdivision of that broader

area may not be considered. *See* 639 F.3d at 1086. Idiosyncratic impacts of Vision's program in Michigan would only be significant if they drove Vision to specifically target Michigan over other states (which would morph the program into a Michigan-specific variation). As already discussed, plaintiffs have not provided evidence that Vision specifically targeted Michigan in its acquisition and disposition practices. To the contrary, ACM supplies data, which plaintiffs do not dispute, that Vision LOP dispositions in Michigan are roughly equal to those in Illinois, Indiana, and Ohio. *See* ECF No. 185-6 (LOP sales accounted for 64% of Vision dispositions in Michigan, 68% of its dispositions in Illinois, 78% of its dispositions in Indiana, and 82% of its dispositions in Ohio).

In sum, plaintiffs have not supplied evidence to establish Vision's Michigan homebuyers as the proper total group by which to measure any racial disparate impact from its residential acquisition and disposition program. They also offer no evidence that Vision's acquisition and disposition program imposed racial disparate impact on its Midwest homebuyers.

To address this deficiency, plaintiffs request that the Court re-open discovery so that they may show that such disparate impact within Vision's Midwest homebuyers. Federal Rule of Civil Procedure 16(b)(4) provides

that "[a] schedule may be modified only for good cause and with the judge's consent." *Bentkowski v. Scene Mag.*, 637 F.3d 689, 696 (6th Cir. 2011). Courts consider five factors for allowing additional time for discovery: "(1) when the moving party learned of the issue that is the subject of discovery; (2) how the discovery would affect the ruling below; (3) the length of the discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to ... discovery requests." *Id*. (internal quotation marks omitted). "The overarching inquiry in these overlapping factors is whether the moving party was diligent in pursuing discovery." *Id*.

The Court finds that plaintiffs were not diligent in seeking the desired discovery, and that all five factors weigh against re-opening discovery. This case has been pending for three full years, and the parties extended the discovery period to August 15, 2022. ECF No. 138. Plaintiffs had notice of the issue over defining the contours of the group by which disparate impact may be measured through ACM's response to their motion for leave to file their second amended complaint, filed in April 2022. *See* ECF No. 158. The issue was placed starkly before it again with this motion, filed August 30, 2022, and was pointedly discussed at oral argument on May 10, 2023, during which the Court emphasized that discovery was closed. ECF Nos.

185, 214, PageID.5774-75. Yet plaintiffs did not seek to re-open discovery until June 30, 2023. ECF No. 221.

Plaintiffs argue that they should be permitted to re-open discovery on this issue because ACM objected to their discovery requests on the basis that they were overbroad in geographic reach. A timely motion to compel was plaintiffs' remedy to obtain discoverable information over the opposing party's objection; re-opening discovery more than a year after it closed, after a motion for summary judgment was fully briefed and argued in a case already three years old is not the appropriate solution to an improperly asserted objection.

The Court finds there was an undue delay in seeking the now-requested additional discovery needed to determine racial disparate impact on Vision homebuyers in the Midwest, despite long-standing and repeated notice that defendants challenged plaintiffs' position that only Michigan Vision homebuyers should be considered. Re-opening discovery now, after the Court has heard argument on the fully briefed motion for summary judgment, would prejudice defendants. Accordingly, the Court will not extend the scheduling order to permit additional discovery.

In conclusion, the Court finds that plaintiffs do not provide evidence that Vision implemented an acquisition and disposition program specific to

Michigan. Plaintiffs point to evidence that Vision targeted its program to urban areas in the Midwest but supply no evidence to show a disparate impact on Black homebuyers in these areas. The Court does not doubt that Vision's practices in flipping distressed residential property to vulnerable and marginalized consumers was manipulative and greedy at best and guileful and predacious at worst—even ACM acknowledges that the Vision LOP program could be "a bad practice" for homebuyers and possibly "contravene . . . state or federal law." ECF No. 222, PageID.5909. But this does not constitute evidence that the Vision program at issue had a disproportionate impact on the minority homebuyers in that program to create a cognizable disparate impact claim under the FHA and the ECOA.[7]

## IV.   CONCLUSION

Plaintiffs do not supply evidence to support that Vision's Michigan homebuyers were the total group to which its home acquisition and disposition program applied. Accordingly, they cannot establish Vision's program had a disproportionate impact on the minorities in the total group to which the policy was applied. ACM, and all defendants are therefore

---

[7] Because the Court finds that defendants are entitled to summary judgment on plaintiffs' FHA and ECOA claims in their entirety, it declines to address ACM's alternative arguments for summary judgment of those claims against it.

entitled to judgment as a matter of law on plaintiffs' FHA and ECOA claims; the motion for summary judgment is **GRANTED,** and Plaintiffs' FHA and ECOA claims (Counts I and II) are **DISMISSED**. Only named in those counts, ACM is **DISMISSED** from the case.

                                                                                 s/Shalina D. Kumar
                                                                                 SHALINA D. KUMAR
                                                                                 United States District Judge

Dated: October 18, 2023